ROSE DISCHNER, APPELLANT, V. LOUP RIVER PUBLIC POWER DISTRICT, A CORPORATION, APPELLEE.

25 N. W. 2d 813

FILED JANUARY 17, 1947. No. 32084.

*Walker, Luckey & Hunter,* for appellant.

*Neighbors & Danielson* and *Walter, Flory & Schmid,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, CHAPPELL, and WENKE, JJ., and POLLOCK, District Judge.

PAINE, J.

This is an action at law by Rose Dischner, owner of a 200-acre farm abutting on the Loup River, against the Loup River Public Power District for damages and depreciation in the value of her farm. Plaintiff charged the defendant with the diversion, during the growing season, of most of the water from the Loup River opposite her farm, by taking out the water and running it through a large canal, and also by the construction of a drainage ditch down to gravel just west of her farm, which interfered with and greatly lessened the flow of ground water toward plaintiff's land, which acts resulted in the loss of her subirrigation and riparian rights, and cut down the farm's productivity for all crops and pasture, as well as destroying many large trees, and altogether damaged her farm in the sum of $20,000.

Defendant filed answer, admitting ownership of the land and the construction of diversion works and canal, but denies other charges, and alleges that the action was commenced more than four years after defendant had completed its construction works, hence it is barred by the statute of limitations.

Trial was had to a jury, which returned a verdict finding for the defendant that plaintiff had no cause of action. Motion for new trial being overruled, plaintiff appealed.

The petition was filed December 5, 1941, against the Loup River Public Power District, hereinafter called District, and may be summarized as follows: Plaintiff alleged that the defendant District was a corporation, with its principal place of business in the city of Columbus; that plaintiff owned a 200-acre farm near Monroe, north of the Loup River, with riparian rights thereto, which farm is highly improved and has been very productive, with hundreds of trees, 30 to 50 years old, ranging in height from 20 to 60 feet; that the top soil of said farm was a sandy loam, of

varying depth, under which there was sand and gravel, and immediately below the top soil the ground water level was from two to six feet below the surface of the ground; that all of the crops on said land, as well as the pasture and trees thereon, were subirrigated and able to withstand practically any drouth conditions.

Plaintiff further alleged that there was subterranean flow of water from the west and northwest, which was also increased by the water in the Loup River, the channel of which was from two to ten feet in depth and about 1,200 feet in width, and which was one of the most steadily flowing streams in Nebraska; that beginning in 1936, defendant constructed diversion works on the Loup River, 11 miles above the plaintiff's land, and took part or all of its water out into a canal 20 to 35 feet deep, which ran about one mile to the north of plaintiff's land. Plaintiff alleged that said canal intercepted the flow of subterranean ground waters from the west and the northwest, lowering the same and decreasing the volume, thereby damaging the plaintiff's land; that the defendant, for the purpose of draining off accumulated drainage water, dug a ditch, 15 to 25 feet deep, from northwest of plaintiff's farm in a southeasterly direction, emptying into the Loup River and running less than half a mile west of plaintiff's land, which ditch intercepted the subterranean water which would naturally have run under the plaintiff's land, to the further damage of the plaintiff; that in the summer of 1938, defendant diverted practically all of the water out of the channel of the Loup River joining plaintiff's land on the south, and as the direct and proximate result of all of said acts the subterranean ground-water level had receded and dropped several feet under the land of the plaintiff, and will continue to drop in the future to a still lower level; that there existed an unsaturated sand and gravel stratum between the top soil and the surface water level under plaintiff's land, so that the top soil will not now hold moisture, and the present underground water will not rise to

the top soil, and the lands are no longer subirrigated, the subterranean water level being unlawfully lowered by these acts of the defendant; that because of the lack of water flowing in the channel of the Loup River said river no longer furnished water for livestock, and plaintiff has been compelled to build a windmill in said pasture and to build fences along the river front to prevent her livestock from straying across the river bed, depriving her of the use of water from the river for livestock and domestic purposes.

Plaintiff alleged that as a direct result of the lowering of said water level a large number of her trees have died and others are nearly dead and will die within a few years; that her land has been rendered unproductive, because the soil is no longer watered by subirrigation; that the normal yield of the land has been decreased, and that the value of the real estate of the plaintiff has been damaged and depreciated in the sum of $20,000 by the acts of the defendant, wholly without reference to any future damages which plaintiff may suffer hereafter.

To this petition the defendant filed answer, admitting the ownership of the land in the plaintiff, admitting that in 1936, defendant constructed the diversion works and canal, which carried the water easterly north of plaintiff's land, but denied each and every allegation not hereinafter specifically admitted.

Defendant alleged that there was a ditch running just west of the plaintiff's land, which was originally the bed of Dry Cherry Creek; that in June 1939, the plaintiff with others filed an action in the district court for Platte County against the defendant, alleging that floodwaters were being diverted into said creek, and that the capacity of the creek was insufficient to carry off the floodwaters, and that she was damaged by the overflow thereof. After a full hearing, the court on July 12, 1940, pursuant to the demands of plaintiff and others, entered a decree requiring the defendant to deepen said creek sufficiently to carry all waters, and defendant complied with the order of the court and deep-

ened said creek and enlarged and improved it, by reason of which, the defendant alleged, the plaintiff is estopped from recovering any damage resulting from said creek.

Defendant further alleged that on February 24, 1934, the Department of Roads and Irrigation of the State of Nebraska granted the defendant 3,500 cubic feet per second of the waters of the Loup River for power purposes, and designated the point of diversion, and as provided in section 81-6318, Comp. St. 1929, agreed to pay to the State of Nebraska $5,011.30 annually as compensation therefor, and thereafter was granted a second lease, for which it pays the State of Nebraska an additional $715.90 annually for increased power head; that defendant has expended a sum in excess of $13,000,000 for the construction of its diversion dam, canal, power plant, and transmission lines, and has diverted and used water under its appropriation and lease, all with due diligence.

The defendant for a separate defense alleged that plaintiff's alleged cause of action was barred by the statute of limitations of the State of Nebraska, and defendant prayed that the action be dismissed.

Thereafter plaintiff filed a reply, denying each and every allegation of defendant's answer except such as are specifically admitted. Plaintiff admitted that she and others procured an order in the district court requiring defendant to provide for drainage of surface and floodwaters away from plaintiff's land, but alleged that defendant had so negligently and carelessly constructed such ditch so deeply that such ditch caused interference with groundwater supply to plaintiff's land, and damage to plaintiff's land as set forth in the petition. Plaintiff further alleged that defendant, in the construction of its diversion works, canal and drainage ditches, and in the operation thereof, had failed to compensate plaintiff for interference with her riparian rights; that any purported appropriation of such river, surface and ground waters without such compensation was unconstitutional and in violation of sections 4 and

6, art. XV, and sections 3 and 21, art. I, of the Constitution; and that no actual damage or injury to plaintiff or to her right to the beneficial use of such waters occurred until less than four years prior to the commencement of this action.

The trial of the action took three weeks, and the bill of exceptions consists of some 900 pages, with nearly 200 exhibits, consisting of maps, water-level records, charts, cross-sections of trunks of trees, large and small photographs, and many glass containers of soil taken from various places on plaintiff's land.

Twelve instructions were given to the jury, and after due deliberation it returned its verdict for the defendant, finding that the plaintiff had no cause of action.

The plaintiff assigns as error: (1) The verdict is not supported by the evidence; (2) erroneous rulings and abuses of discretion by the court, which deprived plaintiff of a fair trial, (a) in pretrial abuse of discretion and in forcing plaintiff to trial with inadequate preparation, and (b) erroneous rulings in admitting remote, confusing, and prejudicial evidence and in refusing to grant a new trial; (3) misconduct of counsel for defendant; and (4) misconduct of the jury.

The first assignment of error, and the one strongly relied upon for a reversal, in the brief and also in the oral argument before this court, is that the verdict is not supported by the evidence.

We have heretofore set out, in brief, a summary of the petition, and the allegations thereof were supported by the evidence of Frank Dischner, husband of the plaintiff. His father gave him this farm in 1923. The next year he moved onto the farm. Later in the year he married the plaintiff, and they have lived there ever since. In 1932, he deeded the farm to the plaintiff. As the plaintiff was only called for a very few questions on rebuttal, we will set out with some care a synopsis of the evidence of her husband given in support of the petition, and which was some 116 pages in length.

The improvements were poor and the land weedy when he moved on the place. He cultivated about 90 acres of the 200-acre farm, and has averaged 60 acres in corn. The first two years he only raised about 35 bushels per acre. From 1926 on the average was 50 bushels or better. From 1924 to 1933, inclusive, his production was just as high as the farms on the tableland to the north. The year of 1934 was a drouth year, and they raised no corn on the tableland, but witness raised 30 bushels on the average. In 1936, another dry year, they raised very little on the table, and witness' corn averaged about 35 bushels per acre. In 1937, the average went up to 50 bushels, also in 1938. Exhibit No. 18 is a crop record issued by AAA from 1939 to date of trial. The witness stated that he had been a member of the AAA committee ever since it started. He started using hybrid seed corn in 1938, planting two bushels, which planted about 12 acres. The rest was open-pollinated, and the production was about ten bushels more on hybrid than on open-pollinated. He had almost the whole place in hybrid in 1940. He started pasturing stock of his own in 1930, and pastured an average of 40 head of cows and their offspring, besides his three or four milk cows and four horses. There was ample pasture until 1939. He rotated his land between corn and wheat, oats and alfalfa hay, the average being 26 bushels per acre for corn. The township committee made an assignment of witness' land as above average, none higher in the township.

In July and August of 1938, the flow of the river was lower than in preceding years. In the fall of 1938, the cattle would go over on the other side on account of the river being so low, and he had to start fencing along the river in order to keep the cattle in their own pasture. In 1939, the water was a trifle lower than in 1938, and witness had to cut corn for the cattle, and other roughage and sargo. There was constant water prior to 1938, and in 1939 it quit. It was the same way with the ponds. The ponds had covered half an acre and had kept up about the

same height prior to that time. Witness put up a mill in September 1939.

In 1940, the pasture came out a little in the spring. In July it started to dry up and there was no grass left. He started to cut the herd down in the fall of 1940, as there was not enough feed for them. The river was lower in 1940 than in 1938 and 1939, and in 1941 there was just a trickle of water in the river. He had to cut down every year, but could not even keep 20 head in 1942, and in 1942, he sold all his cattle. He pastured his three or four milk cows and four head of horses. In 1943, it started off green in the spring, but in July there was no feed left in the pasture. He took in 20 head of mixed cattle, but in July had to notify the owner to get them. In 1944, he had 20 head of calves besides his horses and cows. The river was very low. Whenever the river was low the ponds would go completely dry. They are "plumb dry" in July and August. The bluegrass and clover almost all died out except in the low places. The pasture is empty except four horses and three milk cows. The soil on the farm is a sandy loam. There are three levels on the farm,—about ten acres in the highest level at the north end where the buildings are, then a drop of about 4½ feet with around 50 acres in it, then a drop to a third level. Witness broke three or four acres in 1942. He had a fair yield of corn that year, but in 1943, it started to come down, making about 25 bushels, and the same the next year. There is about a foot of black topsoil, and below it is real fine sand. On the third level there is at least two feet of top soil and then clay. In digging post holes witness would hit water at from 20 to 24 inches deep. Since the diversion you can dig a post hole any place and not find water, except in the rainy season. In July and August you would have to go four feet deep. Before the diversion the water level would come up within two feet of the top of the ground, and the topsoil would be moist in July and August.

The witness raised alfalfa and small grain on the top level, also corn. He put in test wells in May 1942. Less than 30 days before the trial he made soil-test diggings, and found the topsoil a black sandy loam for two feet, representing the second level. The next layer of soil was a kind of sandy clay mixture about 18 inches, and below that white sand.

Before the District constructed its canal the drainage was adequate to carry away the floodwater. When they built the canal they confined the water north of the canal and brought it across the siphon and dug a ditch to one of the roads, but it did not take it all the way to the river. "* * * it was a small ditch in there and they just turned it loose in there and it flooded us." They had not had any flooding for several years before, as the ditch that was there used to take care of that water.

The water ran across witness' farm and did damage, and suit was brought by him or his wife and Mr. Potter and Mr. Hill, and the Supreme Court ordered the District to construct a ditch the rest of the way to the river sufficient to carry that water. The ditch is so deep now that it is down into sand, they created a live stream in there. They put in checks in section five a little north of the main highway. The beavers built dams across the live stream, one south of the railroad bridge and one ¼ mile south, and the railroad wrecking crew took one out. The District put in checks north of the highway, but has done nothing south of it. There is no water at all in Looking Glass Creek now, only when it rains in the spring.

Before the diversion the ponds would stay about the level of the river all the time, but now if the "river stays up two or three days you will see water coming back up in these ponds but if the river only comes up for a few hours you will not see any water in the ponds at all."

Before the diversion there were thousands of trees in the pasture, which provided shade for the cattle and also provided wood, but now many of the trees have died. Witness

dug down where the trees fell and there would be no water there, just dry sand. Over 800 trees have died, and they are still dying, between one-third and one-half of his entire grove. Some young trees have grown up, but not enough to replace those that have died. There would be bluegrass under the trees in the shade, but now there is no grass there at all.

Before the diversion the river bed would be practically filled with running water from bank to bank in July and August, and now in August it is just a trickle, "it is like a sand storm * * * it blows out onto your pasture."

Witness has gone frequently along the lands above the diversion dam west of Genoa, and the ground was wetter up there, "and they have ponds above the head gates where we don't have them below." Witness also went on the land near the river just south of Merchiston and the hay meadow had a good stand of native grass and sod, the pasture still had native grass and sod, and the trees looked healthy. Witness saw no dead trees until he got below the diversion dam.

The ditch intercepts the Looking Glass, and since there has been running water in the ditch there has been no running water in the Looking Glass. Witness put in an irrigation pump, and a good deal of expense will be involved in labor and power, running ditches and laterals.

Witness made an estimate on the loss of income from the farm since the diversion started. Some of the land he cannot raise corn on at all, because it will dry up, and he has to put in small grain and oats, which does not pay the same revenue that corn will, and he cannot pasture anywhere near as many cattle now as he could before. He had 50 acres of corn in last year and lost over 20 bushels an acre. If he had not lost the subsoil moisture he would have had at least 15 acres more, which would have produced about 50 bushels more.

Witness was asked as to his loss of pasture as it was in 1944 compared to what it would have produced in stock

in a corresponding year before the diversion, and he replied: "Well in 1944 I only ran 20 head of small calves 350 to 400 pounds when I put them in and before that I would keep 40 head of stock cows in the large pasture and their calves and it cut down to where you could barely carry 20 head of little calves."

Witness estimated that his loss on the farm in 1944 was from $1,800 to $2,000, and would run about the same in 1943 and 1942. In 1941, it would be about $1,500, and in 1940 about $1,200. In 1939, the crop loss just showed up in the south end of the place, and the loss would be less than $1,000. The reasonable market value of the land in 1938, before any of the damage showed up, would be $26,000, including the improvements. After the damage showed up, the value of the 200-acre farm would be between $12,000 and $13,000.

Witness presented as exhibits eleven jars containing samples of soil taken from the various test holes, which were offered in evidence. In his cross-examination some definite facts were brought out. Bench No. 3 is the land at the north end of the farm, is north of the railroad, and comprises 11 acres. Bench No. 2 extends south to the dried bed of the old Looking Glass Creek, and consists of about 50 acres, all in cultivation. The balance of the farm is in bench No. 1, which lies at the south end of the farm, and is mostly pasture land along the north side of the Loup River, although about 24 acres has been in cultivation.

The plaintiff called as her first witness, to support the evidence of her husband, Will Hill, who has lived on the farm immediately east of the plaintiff's land for 38 years, and he testified to the good crops and pasture on these two farms for many years. During the drouth years their farms produced the only corn in the county, and each of them sold seed corn to farmers on higher ground and in the hills where they had raised nothing. He testified as to the drop in the level of the water in the Loup River and of the ground-water levels, which he ascertained from a barrel sunk to

water on his land. He testified that plaintiff's farm had been damaged by loss of subirrigation about 50 percent in value. On cross-examination he admitted that he had a suit similar to this pending against the defendant District.

Gordon Hill, who had farmed with his brother, Will Hill, testified that they had had their cattle in Dischner's pasture and knew the plaintiff's land well. He had been an appraiser for the Production Credit Association for 12 years, and a member of a bank loan committee for a longer time, and placed the damage to plaintiff's farm at half its former value.

The next witness was James Farrar, who owns a large farm 2½ miles west of plaintiff's land, and has known the Dischner land for more than 22 years, at which time he sawed lumber of the trees in the Dischner pasture and put a pipe down to water to hook it up with the engine, and it was only 2½ feet deep to water. He described the fine trees growing there and the pasture. He told of the value of the trees to shade the grass and also shade for the cattle in the hot sun; that ponds from which they used to cut ice north of the river have now dried up. On cross-examination he admitted he had a similar action pending against the District.

Alois Micek owns about 300 acres of land on the south side of the Loup River some three miles from the Dischner land. He testified that he had to put a fence along his pasture land, like plaintiff did, to keep stock from going across the river, and that his pasture land has died out and his pond is lower. On cross-examination he also testified that he has a similar lawsuit pending against the District for damages to his land.

Frank Buggi has lived in this vicinity for 34 years, and owns 50 acres of pasture land less than three miles from the plaintiff's land, on which he has run cattle for over 30 years. He testified that there was quicksand water 18 to 20 inches under the surface, and the land was pretty soft; that in 1936 he had bluegrass and white clover, and now that is

all gone and there are a lot of weeds there; and he has had to fence 60 rods along the river to keep his cattle from going across, and put up a windmill to water his cattle. On cross-examination he admitted that he had a suit pending against this District for damages to his pasture land.

Ernst Lusche, chairman of the AAA, has checked the normal yield on plaintiff's farm for 1938-1941, and had listing sheets from the county office. After an objection had been overruled, he gave as his opinion that plaintiff's farm was one of five farms in Oconee Township having the highest yield of any farms in four townships.

John Kummer has lived across the river from plaintiff's land all his life, and owns a hay meadow of 40 acres directly across the Loup River from plaintiff's land. Before 1939, this hay meadow produced 65 tons of "wonderful hay," but in 1940 only produced 30 tons, and after the water was taken out of the river there were more weeds in it. He built a fence in his meadow in 1934 and had to drive all the posts, for if you tried to dig postholes they would cave in, but since 1940 you can dig a posthole anywhere in his meadow. On cross-examination he admitted he had a suit like this pending against the District.

M. C. Killion has been agent and telegrapher for the Union Pacific at Monroe for 22 years. He owns about a mile of river front just east of Monroe and about two miles west of plaintiff. He has known plaintiff's land for years, and knows that the pasture there now is very poor. He used to fish in ponds on plaintiff's land, and the level of the water in these ponds is now two and a half to three feet lower than it was.

Hugo Fittje farms his mother's place of 584 acres less than three miles west of plaintiff's land. He testified as to marshy, wet spots on his mother's farm that you could not drive through a few years back, and since the water was taken out of the river he went in with a tractor last fall and tilled it and planted brome and alfalfa.

The plaintiff's expert witness was Roy N. Towl, a civil engineer, of Omaha, who has practiced that profession for over 40 years. His experience has been very wide, having worked along the Missouri River from Yankton to St. Louis, on the Platte River from Saratoga, Wyoming, to Platts-mouth, and on the Loup River since 1936. He has also worked in Arkansas, Wisconsin, and Central America.

Exhibit No. 16, consisting of eight sheets, was received without objection, and gives the Loup River readings at Columbus as recorded by the Water Resources Branch of the Geological Survey of the United States Department of Interior.

Exhibit No. 35 is similar data with respect to the Loup River at Genoa, and was received without objection.

Plaintiff's exhibit No. 34 is a chart giving in technicolor the District's flowage diversions of water from the Loup River at Genoa from June 1934, to September 1944, for each of the four summer months for the ten years.

Mr. Towl testified that contracted channels of a river have a tendency to cut deeper, resulting in a filling-in of vegetation and formation of sand bars, and at the Dischner place there are willows as big as your thumb.

Exhibits Nos. 36 to 60 were small pictures, two inches by two inches, called kodachromes, in colors, taken by this witness, touching many important locations referred to in this trial. Objections were made to their being projected upon a screen, but they were overruled, the court suggest-ing that an explanation be given the jury as each was shown. The defendant then objected that, as the lights were off in the courtroom and blinds down, it was impos-sible to take notes on these comments of engineer Towl or plaintiff's counsel, but the objection was overruled, but ques-tions and answers, while each picture was being shown, were taken by the reporter, and appear in the bill of ex-ceptions. The witness explained the drainage and the loss of subirrigation of plaintiff's land from the lowering of the river level because of diversion of the water into the canal.

Mr. Towl testified that the digging of the drainage ditch intercepted the ground water for a considerable distance back that would have gone across the plaintiff's land. This would reduce the production of the land. On cross-examination, he was asked as to the source of this underground water. He said it was rainfall and snow, and would drain down from as far back as 100 miles north and west of plaintiff's land.

As to the effect of the water running down in the power canal, Mr. Towl testified that for a couple of years the amount of ground water would be raised, but after that the bottom of the canal would be sealed up, seepage would stop, and it would cut off that source of ground water.

On recross-examination, witness was asked if he did not ignore the well readings and was not using them. "Q. You said you did not want to put them in because they were not fair, so your opinion must have been contrary to what the well readings showed? A. No I don't have any quarrel with them, I would like to have them explained, and if I can't explain them I would like to have some one else explain them—they are tough."

The witness also testified that the county had done some draining or improving up there, and the District should only be blamed for what it did.

The defendant's evidence required over 400 pages of the bill of exceptions, and to set it out in detail would make this opinion too long. To summarize, we may say that the defendant took about the same length of time to put in its evidence that the plaintiff had taken, and each party had an expert witness.

The defendant called about the same number of farmer witnesses as the plaintiff had called. Some of these owned land adjoining the plaintiff's land. Their testimony was direct and positive that there was a very bad drouth there from 1935 to 1938, which hurt all pasture lands, and in many other cases besides the plaintiff's weeds had grown up and replaced the grass, which conditions continued for

several years, but that from 1943 to 1945 pasture and hay lands have steadily improved, and in many cases are back to where they were before the drouth.

A number of other, farmers, both those living above as well as those living below the Diistrict's diversion point, have had their trees die because of such drouth conditions, and ponds in many other pastures near the Loup River went dry, as did the plaintiff's.

The defendant's expert witness was Adolph F. Meyer, whose direct and cross-examination occupy about 250 pages. He graduated from the University of Wisconsin, has taught hydraulic engineering at the Universities of Minnesota and Iowa, is the author of "The Elements of Hydrology," which has gone through two editions and is used as a textbook in many colleges. He has made a recent publication which deals with the evaporation of lakes and reservoirs all over the United States. His experience has extended over many states of the Union, Newfoundland, Alaska, and Canada. He has done work on the Platte, Loup, and Niobrara rivers in Nebraska, beginning more than 20 years ago.

He testified at length from many exhibits. One of them, defendant's exhibit No. 21, is a map which shows that the cultivated fields on plaintiff's farm are on three benches,— a small tract of land at the north end between State Highway No. 22 and the Union Pacific Railroad; then a much larger tract reaches south from the Union Pacific; then it shows that the irregular tract of land in Lots 1, 2, and 4 stretches out east and west on the north side of the Loup River. There is shown the area of the marsh or pond, then a small cornfield south of it, and then the area occupied by the trees, all in the pasture land of plaintiff's farm.

In a straight line running slightly west of north, exhibit No. 21 shows a line of test wells, Nos. 196 and 197 being immediately south of the plaintiff's farm on this south bank of the Loup River, and two wells, being Nos. 198 and 199, in plaintiff's land on the north side of the river. In addition, exhibit No. 21 shows a large number of circles, with an ar-

row pointing therefrom, showing in what spot pictures introduced in evidence were taken and the direction the camera pointed, and small squares indicate the location of several soil pits in the pasture land.

Mr. Meyer explained to the jury the exact situation of the water flowing in the canal and in the North Loup River, as well as the great body of water, called ground water, coming down from the north and west. He presented two graphs, exhibits Nos. 25 and 26, each about six feet long, which showed in profile the bed of the ground water, in blue, underlying the hills north of the District's power canal, and the graph carried the profile of the surface of the ground and the underground-water level straight across the Loup River. The height of the ground water in test well No. 58, north of the power canal, was about 1520 feet above sea level, while at test well No. 245, about two miles to the south and far south of the Loup River, the top of the ground-water level is 1495.5 feet above sea level, showing a steady descent in elevation, which was not affected in the slightest by the water in the power canal or the water in the Loup River.

This graph shows that, while the power canal water mingled with the ground water, it did not in any way change the flow of the surface of the ground water which fills the gravel bed underlying this part of Nebraska.

To some extent the steepness of the slope of the surface of the ground determines the level of the ground water, for the steeper the hill the faster the ground water flows. The bench land on the plaintiff's farm is so high above the normal ground water that it cannot get any subirrigation, for the ground water will not rise through sand up to a height of six or eight feet. On the lower bench of plaintiff's land, where the pasture is located, there may be some sub-irrigation, for water will rise by capillarity, like it does in a wick, perhaps six inches if the soil is of fine texture, and in very fine soil a foot, but not more.

The test wells show a drop in the level of the ground water in summertime and a recovery in wintertime. Mr. Meyer also testified that the diversion of the water from the Loup River into the canal had no effect at all on the ground water under the plaintiff's land, and further, that the ground water is entirely independent of the flow of the water in the river, and that the ground water was feeding the river, and not the river feeding the ground water, and the great volume of ground water in the gravel bed moved steadily on to the south and east, with no interference by the power canal, by ponds, or by the river.

Witness Meyer gave an exhaustive explanation of the growth and the death of the trees on the Dischner place. Exhibit No. 54 was a half disk cut from the stump of a 72-year-old ash tree, $14\frac{1}{2}$ inches in diameter. He explained to the jury that the tree was cut down in 1944. You begin counting the rings back from the outside. Each ring indicates the growth made that year, and comparing that with the rainfall chart this tree made three times as rapid a growth from 1940 to 1944 as during the years of heavy moisture. Other exhibits indicated that the growth of these trees did not show the slightest effect of the diversion of water into the power canal, nor any change in the river. Pictures were taken showing the roots of dead trees that were trying to spread out in three or four inches of topsoil where there was moisture, but did not go into the dry sand below. It was testified that the cottonwood is a short-lived tree, 40 to 50 years on the average, while an oak will live twice that long. The evidence tended to prove that these trees died from causes other than the alleged acts of defendant.

With this lengthy, but possibly inadequate, presentation of the evidence in this record, we have reached the conclusion that the jury clearly understood the claim for damages made by plaintiff because of the diversion of the water from the Loup River and the alleged neglect of defendant in constructing a drainage ditch down to gravel west of

plaintiff's land. This claim was that the defendant intercepted and cut off a part of the underground flow of water which otherwise would have reached plaintiff's land, and the alleged neglect of defendant charged was in the construction and operation of its power canal north and west of plaintiff's land to such a depth as to cut off the underground flow of water from that direction, and the lowering of the water table under plaintiff's land. The jury, after sufficient deliberation and after proper instructions, returned its verdict for defendant.

The motion of the defendant at the close of all of the evidence was properly overruled, because disputed questions of fact in a law case are for the jury under proper instructions, and not for the trial court. This rule is based on the maxim that it is the office of the judge to instruct the jury on the points of law, and of the jury to decide on matters of fact. Brewer v. Fischer, 144 Neb. 712, 14 N. W. 2d 315.

Where there is a reasonable dispute as to what the physical facts show, and the conclusions to be drawn therefrom, and when the evidence of the witnesses is in sharp conflict, then the credibility of each witness, the probative weight to be given to his testimony, and any proper inferences therefrom are questions lying clearly within the sole province of the jury. Moore v. Krejci, 139 Neb. 562, 297 N. W. 913.

Again, where the evidence is in conflict, and is such that reasonable minds may draw different conclusions therefrom, then a verdict of the jury, supported by substantial and competent evidence, will not be set aside on appeal. Ingersoll v. Sullivan, 145 Neb. 761, 18 N. W. 2d 119.

The evidence is in the sharpest conflict. Many witnesses were called by each party. Distinguished and experienced engineers in this field of science testified at great length, after making most careful studies in the field, and they differed on the points at issue, and gave reasons for their opinions and conclusions from the facts. The jury could

have accepted the conclusions of either engineer. This case clearly presents a jury question, and the verdict of the jury is sustained by the evidence of the defendant's witnesses.

This court has reached the conclusion that the first assignment of error, that the verdict is not supported by the evidence, is not sustained.

The second assignment of error alleges erroneous rulings and abuses of discretion by the court in forcing plaintiff to trial with inadequate preparation.

It appears that present counsel for defendant tentatively accepted employment from the plaintiff in 1938 and 1940, but later declined to represent plaintiff and became counsel for defendant. Plaintiff then employed Rodney Dunlap, of Fremont, as attorney, who took charge of the case, filed petition December 5, 1941, and filed 18 similar cases for other clients, and died unexpectedly in April 1944. Defendant's answer was filed December 5, 1944. Mr. Abbott, senior partner of Mr. Dunlap, then secured Mr. Deutsch to try this case, which was set for trial April 16, 1945, and in February 1945, Mr. Deutsch withdrew as counsel, and present counsel was procured by plaintiff, who filed a reply and a motion and affidavit for continuance until the September term of court. Judge Lightner called in Judge Landis to hear the application for continuance on April 4, 1945, and after a hearing and arguments he overruled the motion. Counsel for defendant then agreed in open court to a continuance from April 16 to May 28, 1945, on which date the trial began and the jury was impaneled, and a recess was taken to May 31. Trial continued for two days, and then a recess was taken to June 5. On June 8, a further continuance was had until June 11. Later another recess of three days was taken. Then trial continued until it was finished.

In one of the affidavits filed by attorneys for defendant, it is set out that plaintiff's present counsel had filed three similar actions in January 1942, which would indicate that

they had considerable information as to the law and facts in this kind of litigation.

This court from the record is satisfied that the trial judges who ruled thereon did not abuse their discretion in denying plaintiff a continuance. Therefore, we find no merit in this alleged error.

As to the many assignments of error in rulings of the court on objections of plaintiff's counsel to the admission of evidence, which objections were overruled by the court, we will not use the space to discuss each of them separately, but upon examination thereof we find no merit in any of these assignments of error.

As to the assignment of error which alleges misconduct on the part of the defendant's counsel, we have made a careful examination of each of the 30 grounds set out in the motion for a new trial filed in the district court and find no similar charge. It has been a well-established rule that assignments of error raised for the first time in this court, and not first brought to the attention of the district court, will ordinarily not be considered here.

The last assignment of error is based on the alleged misconduct of a juror. Lowell Walker, one of the attorneys for the plaintiff, filed an affidavit in support of the motion for a new trial, in which he says he asked each and every prospective juror this question: "Have you any close relatives by blood or marriage who are employed by the defendant, Loup River Public Power District?", and that to this question Emil Mueller answered "No"; that it appears the juror Mueller's daughter is married to a son of a regular employee of the District, and that his attitude and demeanor during the trial indicated greater interest in, and more favorable impression by, testimony favorable to the defendant.

This alleged error is further supported by affidavit of Michael J. Lassek, who is plaintiff in a similar suit against the District, and without knowing Mueller was a juror, Lassek says, he made some remark about the case, and

Mueller replied, "I can't see where the diversion made any difference," and affiant watched him thereafter during the trial and noticed that he seemed to be favorably impressed by defendant's evidence. ·

Juror Mueller's own affidavit stated that on his voir dire examination he answered a question about his knowledge of facts asked by Mr. Walker as follows: "I was asked by plaintiff and others to join in this litigation against the Loup River Public Power District but refused to do so. This fact would not make it so that I could not render a fair and impartial verdict." In response to another question by Mr. Walker, affiant replied: "Yes, my son worked for the Loup River Public Power District for a few weeks." Mr. Mueller says that he neglected to mention the fact that his son-in-law's father was employed on the maintenance crew of the District, as he considered that such relationship was too remote.

This evidence was all submitted to the trial court on the hearing on the motion for a new trial, and, knowing all the parties, he decided that there was no prejudicial misconduct shown on the part of juror Mueller, and we find his ruling thereon to be correct.

Having considered each of the assignments of error, and finding no prejudicial errors therein, we hereby affirm the judgment of dismissal entered on the verdict for the defendant.

AFFIRMED.