RAYMOND R. COX, ADMINISTRATOR OF THE ESTATE OF SHIRLEY L. COX, DECEASED, APPELLEE, V. DANIEL BABINGTON, APPELLANT.

90 N. W. 2d 64

Filed May 9, 1958. No. 34375.

*Story, Pilcher & Howard,* for appellant.

*Fitzgerald, Hamer, Brown & Leahy* and *Lyle E. Strom,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought in the district court for Douglas County by Raymond R. Cox, administrator of the estate of Shirley L. Cox, deceased, as plaintiff, against Daniel Babington, defendant. The purpose of the action was to recover damages for the wrongful death of Shirley L. Cox due to the negligence of the defendant in causing a collision between an automobile driven by him and an automobile driven by the plaintiff's mother in which the deceased was a passenger. Trial was had to a jury resulting in a verdict for the plaintiff. The defendant filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial. This motion was overruled. From the order overruling said motion, the defendant appealed.

The plaintiff's petition, insofar as it need be considered, alleged in substance that Shirley L. Cox, the plaintiff's wife, was riding as a passenger in a Studebaker automo-

bile operated by Mabel N. Morris in an easterly direction upon L Street in Omaha, and when said automobile reached a point on the L Street Viaduct approximately 190 feet west of the intersection with Twenty-ninth Street, a Buick automobile driven by the defendant in a westerly direction upon L Street was negligently driven by the defendant in part upon the south half of L Street into and against the said Studebaker automobile which collision caused the death of Shirley L. Cox; and that the negligence of the defendant which proximately caused the collision and resulting damages, injury, and death consisted of the following: (1) In failing to maintain a proper lookout for approaching automobiles and particularly the automobile operated by said Mabel N. Morris; (2) in failing to accord to the automobile driven by Mabel N. Morris the use of the south half of the traveled portion of the L Street Viaduct, and in not driving said Buick automobile on its right half, or north half, of the traveled portion of said L Street Viaduct; (3) in driving said Buick automobile upon the south side of the center of the L Street Viaduct in such manner as to cause it to come into collision with the automobile driven by Mabel N. Morris; and (4) in failing to keep said Buick automobile under control.

The defendant's answer to the plaintiff's petition alleged that the collision referred to therein was due solely and proximately to the negligence of Mabel N. Morris, the driver of the Studebaker automobile. The defendant denied every allegation contained in the plaintiff's petition not admitted in the answer.

The plaintiff's reply to the defendant's answer denied generally the allegations contained therein except those which were admissions of allegations contained in the plaintiff's petition.

For convenience, and as occasion requires, we will refer to Raymond R. Cox as plaintiff; to Daniel Babington as defendant; to Shirley L. Cox as the deceased; to

the defendant's automobile as the Buick; and to the automobile driven by Mabel N. Morris as the Studebaker.

The record discloses that the accident occurred at about 1:30 a.m., on May 19, 1956, and that the deceased was a passenger in a 1952 model Studebaker automobile operated by Mabel N. Morris, the plaintiff's mother and the deceased's mother-in-law. Both Shirley L. Cox and Mabel N. Morris were killed in the accident. The defendant, at the time of the accident, was operating his 1954 model Buick automobile. The Studebaker was proceeding in an easterly direction and the Buick was proceeding in a westerly direction when the accident occurred on the L Street Viaduct extending between Twenty-seventh and Thirtieth Streets in Omaha.

It was established that the plaintiff is the duly appointed, qualified, and acting administrator of the estate of Shirley L. Cox, deceased.

There is a plat in evidence, drawn to scale, which represents that portion of the L Street Viaduct as it existed on May 19, 1956, and shows the roadway on the part of the viaduct where it is claimed the collision occurred. This roadway is 43 feet in width, leaving 21½ feet in width for eastbound traffic and 21½ feet for westbound traffic on the viaduct. The viaduct extends uphill from the west end to a point a short distance west of the Stockyards Viaduct intersection which is 344 feet from the west curb line of the L Street Viaduct. The plat shows this to be a 6 percent grade. Along both the north and south sides of the roadway there is an elevated wooden plank walk 5 feet wide for use by pedestrians, and on the outside edge of these walks there is erected a wooden guardrail. On the south side of L Street at the west end of the L Street Viaduct there was a traffic light which regulated the use of lanes of traffic by eastbound vehicles.

A night watchman for the Sutherland Lumber Company, which is about 200 feet north of the west end of the L Street Viaduct, testified that about 1:30 a.m., the

day of the accident, he was sitting in his automobile on the west side of the lumberyard, a distance of 400 to 500 feet from the viaduct. He heard a crash. He then walked over to the viaduct where he met a man and they went up the viaduct on the north walk to the place where a Buick automobile was standing. Afterwards he went across the street to where a Studebaker automobile was standing. He and the man he met were the first persons to arrive at the scene of the accident. They opened the door of the Studebaker and helped while another man got some children out. The children were down on the floor between the front and back seats. He then returned to the Buick on the north side of the viaduct where he heard the defendant tell how badly his automobile was mashed up, and ask a bystander if he had a car. The bystander said he did, and the defendant asked him to take him home as he had to go to work the next morning. This witness then examined the interior of the Buick and saw a package which he later observed to be a 6-pack of beer, containing five cans of beer. After that he went across the street to help get the ladies out of the Studebaker. Afterwards he observed debris on the pavement. He testified that this debris was in the second lane on the south side of the roadway, which would be on the south half of the L Street Viaduct. With respect to the Studebaker, it was east of the Studebaker a distance of 50 to 60 feet. He observed only a little metal from the cars on the north half of the L Street Viaduct in an area of 40 to 60 feet from both automobiles. He believed this metal to be pieces off the front of the bumpers, or bumper guards. He observed no dirt or fine pieces of glass or anything of that nature on the north side of the roadway in an area from 40 to 60 feet east of the automobiles. He further testified that one car went through the area prior to his arrival at the scene of the accident; that he met this car going west at the end of the viaduct; and that there was another vehicle that went west after

he arrived where the Studebaker and Buick were standing. He did not notice where that vehicle went in relation to the debris. Shortly thereafter police officers arrived. He found an open can of Falstaff beer under the viaduct directly beneath the Buick, which he turned over to a police officer. He further testified that the police arrived about 10 to 15 minutes after he arrived. They then blocked off the traffic on the viaduct from both the west and east.

On cross-examination this witness testified that by the term "debris" he meant mud and dirt, anything that is underneath an automobile or that would cling to the bottom of an automobile; and that he saw no mud or dirt anywhere else on the viaduct. It was about 10 minutes before people arrived and were walking around on the roadway. He saw the rescue squad car come from the east. It passed over the viaduct. He also saw the police cars come from the east, but did not notice any that came from the west. There were several police cars there. The police ambulance came from the east. At the time of the crash he saw a big cloud of dust which rose 15 to 20 feet, covering quite a big space. He was at the scene of the accident when the wrecker car came to pull away the damaged cars. This was about an hour after the accident. He was interested in taking care of the people in the Studebaker. He did not see any gouge mark of any kind in the pavement and did not examine the north side of the pavement of the viaduct at that time.

A police officer who was called to the scene of the accident arrived at about 1:45 a.m. He testified that he and his partner were the first police officers to arrive. Upon arrival he went to the Buick where he had a conversation with the defendant who admitted that he was the driver of the Buick and asked the officer to take care of his car, and said that he did not know how he was going to get to work. This officer asked the defendant how much he had had to drink and the defend-

ant stated: "A few beers." The officer then proceeded to the south side of the roadway to the Studebaker. Shortly after arriving at the scene of the accident he was ordered to go to the west end of the viaduct to direct traffic north on Thirtieth Street. From the time he arrived until he went to the west end to direct traffic, only one car went over the viaduct. The rescue squad arrived shortly after he and his partner arrived. On cross-examination he testified that the ambulance and rescue squad car came from the east to the west, and that other police cars arrived.

Police officer Shestak, assigned as a traffic investigator, testified that he was advised at 1:47 a.m., that there had been a collision in the vicinity of Twenty-ninth and L Streets. He arrived at the scene of the accident about 5 minutes after receiving the call. Other police officers had preceded him to the scene of the accident. The defendant was not there when he arrived. The deceased was in the rescue squad car. He checked the registrations of the automobiles involved in the collision, and proceeded back to his cruiser car to assemble his camera and then proceeded to take pictures. He took five pictures within a period of half an hour. These photographs were admitted in evidence.

Officer Shastak further testified that he observed a pile of dirt and debris, some broken glass, and a horse-shoe-shaped gouge mark in the roadway. The gouge mark was white and clean, and was located 2 feet south of a line which was made by the overlapping of the asphalt. This line made by the asphalt overlap was 21 inches south of the center of the roadway, so the gouge mark was 3½ to 4 feet south of the center of the L Street Viaduct roadway. This mark was 189 feet west of the west curb line of Twenty-ninth Street, and the accumulation or pile of dirt and debris was south to southwest of the gouge mark extending over an area of approximately 8 feet. This witness further testified that there was no dirt or debris, similar to that which

he described as being found on the south side of the L Street Viaduct, on the north side of the viaduct or north of the gouge mark. Nor was there any dirt or debris on the north side of the viaduct within an area of 15 feet from the north curb. He further testified, as a traffic investigator, that as a result of the impact of vehicles dirt and debris of the kind he observed were deposited. Upon his arrival he saw the Studebaker which was 47 feet southwest of the gouge mark, measuring to its right side center. The Buick was 59 feet northwest of the gouge mark. He observed no tire marks either on the east or west of the gouge mark, or the north or south half of the viaduct. After an investigation at the scene of the accident, he went to the county hospital where he saw the defendant and questioned him. The defendant said that he did not know what happened, and that he must have fallen asleep. The defendant also stated that he had bought some beer in Council Bluffs, Iowa. This officer observed that the defendant had been drinking. He smelled liquor on his breath. He had found five cans of beer in a 6-pack in the defendant's automobile. While this officer was there, inspector Whinnery of the police department who was also there asked the defendant if he would submit to a blood test. The defendant indicated that he wanted permission from his mother to take the test. The defendant stated that he drank a couple of beers. He made no statement about the Studebaker coming over into his path.

On cross-examination this witness testified that when he arrived at the scene of the collision, at approximately 1:52 a.m., traffic across the viaduct had been blocked off; that at the time he took the pictures at the scene of the accident the sheriff's car was there at a point west of the Studebaker and Buick and facing west; that a rescue squad car was there, and other police automobiles were also at the scene of the accident, and quite a few pedestrians were there when he arrived and

were in different places over the area; that debris that comes from the undercarriage of automobiles is loose when it falls out, can be kicked around, and the wind will blow it; and that the place where the debris goes when two automobiles collide is determined somewhat by the direction of the automobiles and the momentum of the same at the time they stop. He further testified that he had to clear out the traffic and the pedestrians before he could take the pictures.

An inspector of police testified that he had 22 years experience in the police department and had received training in traffic investigation and administration, which training included dynamics of accidents with respect to directions of force and depositing of debris, and tire marks referred to as physical facts that surround traffic accidents. This witness testified that police regard the location of the debris in the way of dirt that has accumulated under the undercarriage of automobiles as a matter of significance with respect to where a collision has occurred, that is, on one side of the center of the street or the other side of the center of the street. However, he did not discuss the explanation of the collision with the defendant, nor was he at the scene of the accident until the day after it had occurred. He saw the defendant at the county hospital when he arrived there about 2:45 a.m., and talked to the defendant. He further testified that the defendant was logical in his answers to the questions propounded to him. The defendant told the inspector that he had a couple of beers at the H and H Tavern, and that after that he had been driving around. At first the defendant was evasive, and towards the end of the interview he became belligerent. At no time while the inspector was interviewing the defendant did the defendant make any statement that the Studebaker was on the north half of the viaduct roadway or that it jumped over into his path and caused the collision. In the inspector's opinion the defendant, at the time he

talked with him, was under the influence of intoxicating liquor.

A surgeon on duty when the defendant was brought to the Douglas County Hospital testified that he was present during the time the defendant was being questioned by the inspector of police. He ordered a hypodermic injection of Demerol for the defendant. He could not say whether or not the defendant was intoxicated, but testified that the defendant did act like a lot of people act who have been in automobile accidents, and that the defendant, with support, walked into the hospital. The defendant was conscious and had normal blood pressure. This witness gave the defendant no treatment for shock because it was not necessary. He further testified that the defendant made no statement or claim that the Studebaker came over onto the north side of the viaduct or that it jumped over directly into his path of travel.

A city fireman, captain of the rescue squad, was notified of the accident about 1:45 a.m., and arrived at the scene of the accident at 1:47 a.m. He helped remove the occupants of the Studebaker. He testified on cross-examination that while he was at the scene of the accident he saw no cars drive either east or west over the viaduct; that in arriving at the scene of the accident he had driven over the viaduct from the east proceeding west; that he stopped his vehicle with its back end about even with the Studebaker; and that there were about half a dozen people scattered about trying to help.

Photographs, as exhibits in evidence, show the Studebaker to be on the south side of the roadway facing northwest, the Buick on the north side facing southwest, and that the Studebaker and Buick were both damaged on the left side and front.

The defendant testified that he was 24 years of age; that he was employed at the Independent Metal Products Company; that he attended Omaha University; that he owned a 1954 Buick; that the accident happened

about 1:30 a.m.; that he had come onto L Street at Twenty-fifth Street; that he was alone in his automobile; that he was going west on L Street; and that there were signal lights at Twenty-sixth and Twenty-seventh Streets but his progress was not stopped by them. He was traveling about 25 miles an hour as he approached the viaduct and continued to operate his car at that speed. When he was traveling on the viaduct, he was on the north side of the roadway. As he started down the west incline of the viaduct he was in the north lane and his car was approximately 6 feet in from the north curb of the roadway. As he passed the last traffic light he saw an automobile approaching from the west. It was about at the bottom of the viaduct at that time, that is, where the viaduct starts going to the east. He continued to observe this approaching car and saw it at the bottom of the viaduct, and as he went through the green light, keeping on his side of the roadway, the other car was approaching up the viaduct and all of a sudden its driver jerked the car onto the defendant's side, or north side of the roadway. He was unable to estimate the speed of the approaching car. The two cars collided after the approaching car was jerked over into the defendant's lane of travel. The defendant's car was facing west and the approaching car was facing northeast at the time the two automobiles came together. He further testified that he did not know what happened. There was just a crash, and the next thing he knew he woke up in St. Joseph's Hospital where he was in bed. He also testified that he had a carton of beer in his car in a sack, and that he had not consumed any of it; that he made no investigation of the accident at all; and that he did not remember of having any conversation with the two police officers at the county hospital.

On cross-examination the defendant testified that he had purchased the 6-pack of beer at a bar in Council Bluffs about midnight before the accident; and that he

stopped to purchase it after he left the Seventeen Club located in downtown Council Bluffs. While at the club dancing, he said he had a "small beer." After purchasing the 6-pack of beer he drove, by himself, in Council Bluffs for about 45 minutes. Then he proceeded across the Douglas Street Bridge to Thirteenth Street, south on Thirteenth Street to Vinton Street, west on Vinton Street to Twenty-fifth Street, south on Twenty-fifth Street to L Street, and west on L Street to the scene of the collision. He further testified that he arrived at Twenty-fifth and L Streets at about 1:25 a.m. He further testified that he saw the oncoming lights of the Studebaker when he was in the intersection of the L Street Viaduct and the Stockyards Viaduct, and at that time the Studebaker was at the west end of the viaduct.

In rebuttal, a court reporter testified to certain questions and answers given by the defendant in response to questions of the deputy county attorney with regard to the accident, in which the defendant stated that he went to Council Bluffs and drove around the south side of the city and came back; that he did not stop at any place in Council Bluffs; that he did not know what happened; that he "passed out"; that he did not see the other car, and never did see it; and that he was driving west on L Street.

The defendant made a motion at the close of the plaintiff's evidence and at the close of all of the evidence for a directed verdict or in the alternative to dismiss the plaintiff's petition. These motions were overruled.

The defendant assigns as error that (1) the trial court erred in overruling the defendant's motion to direct a verdict in favor of the defendant or in the alternative to dismiss the plaintiff's petition at the close of all the testimony; and (2) the trial court erred in overruling the defendant's motion for judgment notwithstanding the verdict, or in the alternative to grant the defendant a new trial.

A motion for directed verdict or for judgment notwithstanding the verdict must, for the purpose of decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference that can reasonably be deduced from the evidence. Hilzer v. Farmers Irr. Dist., 156 Neb. 398, 56 N. W. 2d 457.

"The rule is that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed." Farr Co. v. Union P. R. R. Co., 106 F. 2d 437. See, also, Guerin v. Forburger, 161 Neb. 824, 74 N. W. 2d 870; Davis v. Dennert, 162 Neb. 65, 75 N. W. 2d 112.

"Negligence is a question of fact and may be proved by circumstantial evidence. All that the law requires is that the facts and circumstances proved, together with the inferences that may be legitimately drawn from them, shall indicate, with reasonable certainty, the negligent act complained of." Davis v. Dennert, supra. See, also, Rocha v. Payne, 108 Neb. 246, 187 N. W. 804; Shields v. County of Buffalo, 161 Neb. 34, 71 N. W. 2d 701.

A witness may describe the marks that he observed near the place of an accident. The inference to be drawn from the testimony regarding such marks is solely the province of the jury. See, Davis v. Dennert, supra; Danner v. Walters, 154 Neb. 506, 48 N. W. 2d 635.

The plaintiff's case, to a large extent, depends upon circumstantial evidence. We have said in this regard: "All that plaintiff was required to do was to establish, to a reasonable probability, that the accident happened in the manner alleged in his petition, and where facts

and circumstances are established from which the way the accident happened could be logically inferred, it was not error to submit that issue to the jury." Markussen v. Mengedoht, 132 Neb. 472, 272 N. W. 241. See, also, Taylor v. J. M. McDonald Co., 156 Neb. 437, 56 N. W. 2d 610; Davis v. Dennert, *supra*.

The defendant contends that the gouge mark, as testified to by officer Shestak, is not related in any manner to either automobile or any part of the same, nor does it disclose the position of either automobile in the roadway at the time of the impact; that the debris in the roadway, as testified to by officer Shestak and the night watchman, had been run over by several automobiles on both sides of the roadway and trampled upon by pedestrians before it was observed by any witnesses and consequently is not satisfactory evidence of what occurred; and, in addition, that officer Shestak admitted that there was debris on the north half of the roadway. Therefore, the evidence was insufficient to submit the case to the jury.

Applying the rules of law heretofore set forth to the evidence, we conclude that the jury had a right to consider all of the direct and circumstantial evidence and the physical facts to determine whether or not the defendant was guilty of negligence as charged in the petition of the plaintiff. Suffice it is to say that the evidence discloses a conflict therein sufficient to submit the case to the jury, and the trial court did not err in so doing.

In addition to the physical facts as heretofore set forth and the inferences which with reasonable certainty may be drawn therefrom, there is also the testimony of the defendant that he "passed out" or must have fallen asleep when he was asked by officer Shestak and the deputy county attorney about what happened that evening on the viaduct. This type of testimony relates itself to whether or not the defendant kept a proper lookout for the oncoming Studebaker in which the plaintiff's decedent was a passenger. The plaintiff's petition

contained an allegation of negligence to the effect that the defendant did not keep a proper lookout as heretofore set out in the opinion.

"Where there is a reasonable dispute as to what the physical facts show, and the conclusions to be drawn therefrom, and when the evidence of the witnesses is in sharp conflict, then the credibility of each witness, the probative weight to be given to his testimony, and any proper inferences therefrom are questions lying clearly within the sole province of the jury." Dischner v. Loup River Public Power Dist., 147 Neb. 949, 25 N. W. 2d 813. See, also, Moore v. Krejci, 139 Neb. 562, 297 N. W. 913.

"Where different minds may reasonably draw different conclusions or inferences from the adduced evidence, or if there is a conflict in the evidence, as to whether or not the evidence establishes negligence or contributory negligence, and the degree thereof, when one is compared with the other, such issues must be submitted to a jury." Pierson v. Jensen, 150 Neb. 86, 33 N. W. 2d 462. See, also, Davis v. Dennert, supra.

For the reasons given herein, the judgment of the trial court is affirmed.

AFFIRMED.