IDA B. BOWERMAN, APPELLANT, V. NATHAN H. GREENBERG ET AL., APPELLEES.

7 N. W. (2d) 711

FILED JANUARY 15, 1943. No. 31488.

722

· *Arthur C. Pancoast,* for appellant.

*Gaines & Shoemaker, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

MESSMORE, J.

This is a damage action for personal injuries sustained by the plaintiff in a fall on a rubberized mat, stripped and woven together with wire, that is spread before the entrance into the defendants' store at 1518 Farnam street in the city of Omaha, Nebraska. At the conclusion of the plaintiff's evidence, a motion for a directed verdict was sustained. Motion for a new trial was overruled. The plaintiff appeals.

The record discloses that the plaintiff, a widow, employed in a clerical position at the Supreme Council of the Woodmen Circle for about the past eight years, left her place of employment, together with other employees, in a cab at Thirty-third and Farnam streets in Omaha for a downtown district, on June 18, 1941, the plaintiff having a half-hour for lunch between 12 and 12:30. After arriving at her down-town destination, she proceeded to the defendants'

store, which is between Fifteenth and Sixteenth streets on Farnam, facing south, to have her glasses repaired. She entered the store without noticing the rubberized mat, or that it had any raises in it or corners curled, and, having 10 minutes to spare, she left the store with the intention of turning west, crossing the intersection and then proceeding north to the Brandeis store. It was while she was leaving the store that the accident happened. As the question involved is the sufficiency of the evidence to take the case to the jury, we shall recite the evidence which deals with the fall, causing plaintiff's injury.

The mat in question is made from reclaimed rubber-tire casings, stripped and woven together with wire, and is about 30 inches wide. The entrance to the doorway of the store is approximately four feet in width, which would leave nine inches on each side of the mat, with windows and show cases on either side. The mat is fastened with pins or pegs at the top end, next to the door leading into the store, that hold the mat in place. One pin was missing and had been missing for a number of years. It had worked loose from the cement and was removed by the defendants. The mat had been in use for several years. It extended the length of the ramp and a few inches beyond the entrance. There was a steep incline into the door from the entrance, 10 feet in length. The plaintiff was just nearing the end of the mat, was going to make the turn to the west, and was not off the mat, when she fell.

With reference to the accident plaintiff testified as follows: "Q. Did you get clear out of the entrance way? A. No, I had not left the entrance way. I was just nearing the end of the runner, or this mat, and was conscious of going to make this turn, but I had not left, or was not off that mat. I was nearing the end of it, just the same as if you were approaching the street and starting across, you are conscious of watching those lights. Q. What happened then? A. Something caught me and jerked my feet out from under me and pitched me out onto the sidewalk. (It might be remarked here that the plaintiff was wearing

shoes with Cuban heels, about one and three-fourths inches in height and known as a sensible heel.) Q. How did you land there as to your arm and hand and so on? A. I am left-handed and was carrying a white under-arm bag. I was carrying it under this arm, holding it like this (indicating), and as it pitched me I threw out my left hand to break the fall, and came down on my knee, square, breaking the patella bone of the knee cap. Q. Of course, at the time you didn't know that? A. No, I didn't know what had happened, but I was injured and in excruciating pain. I knew that. * * * Q. Well, just tell us a little more in detail how this happened. A. Something jerked my feet out from under me. I don't know which foot it was, but it just jerked me and pitched me head first out on the sidewalk. Q. What was it that jerked? A. It was the mat. Q. What was the mat doing when it jerked you? A. Well, it evidently slipped, because it threw me with terrific force." This answer was objected to but was permitted to stand. Cross-examination: "Q. You don't have a definite recollection then as to how far from the end of the mat you were, or how far from the side of the mat you were when you fell? A. I know I had not made the turn, and I know I was near the end of the mat. * * * Q. So that any slipping of the mat would have to be in a north and south direction? A. Not necessarily. If I was ready to make the turn, it would have pulled me. Q. Ready to make the turn? A. Yes, if I was nearing the turn. I wouldn't have been out beyond the line, but at the same time, ready to take the step for making the turn. Q. But you don't know, except from your own conclusion, just what you were doing, do you? A. Yes, I do. I know that my feet were jerked out from under me." "Q. Did you see anything unusual on the mat at all when you were coming out? A. No, nothing unusual at all. I don't recall anything. * * * Q. You don't know which foot it was? A. No, I am not positive."

A brother-in-law of the plaintiff, who was a building inspector for the city, inspected the mat the day after the plaintiff's fall. When asked about the condition of the mat,

he stated: "The mat is made of strips of rubberized cloth, fastened together with wires, and at the time I saw it right after the accident, there was quite a marked curl at the edges. The mat wasn't laying perfectly flat on the ramp going into the store. The edges were slightly curled, and apparently, at that time, the lower end was loose, so that the mat could be moved backward and forward if a person stepped on it." "Q. Did you notice anything further about the mat except the curling of the corner, when you saw it the next day? A. Oh, nothing,—the mat shows considerable wear, but not so bad. * * * Q. Have you seen the mat at different times, Mr. Bowerman? A. Yes, I have noticed it several times since then. Q. Did you notice at times when it was changed, as to its curled corners, and so on? A. No, each time I have seen it, it apparently has that curling on the edges. I have never seen it when it was turned over." When shown exhibit 2, a picture of the mat, the witness was asked: "What part of that did you see on the next day that curled up? Does it show on that photograph? A. What do you mean? Q. That is the corner, can you observe that?' A. Well, that is pretty hard to tell from the picture whether there is any curl in that mat or not. I would say, however, that the edges still show a curl." With reference to the peg that was missing, the witness was asked on cross-examination: "And that peg or pin you have spoken of was up near the door, wasn't it? A. Yes." The foregoing constitutes the material evidence as to the manner in which the accident happened.

Plaintiff's allegations of negligence, briefly summarized, are as follows: That defendants negligently and carelessly placed a narrow combination steel and rubberized fabric matting, eight or ten years old, on the ramp, the deep and wide corrugations of which extended lengthwise; that the mat was narrow, not fastened to the floor, covered the central portion of the ramp, and allowed by defendants to be and remain in a worn, loose, dangerous and unsafe condition, and defendants knew or, by the exercise of reasonable care, should have known of its defective condition, in

that the corrugations of the matting, as it extended into Farnam street, were so worn and defective that they were spread apart and did not adhere firmly to the ramp, causing it to slide from side to side; that the rim or sides, the ends and corners of the matting "were defective and worn and curved upward;" that the matting extended about four inches beyond the ramp onto the sidewalk and was loose and movable; that as the plaintiff "reached the end of said ramp and as she partially turned westward to enter Farnam street, and without any fault or negligence on her part, her foot tripped on said loose defective matting and the matting and her feet slipped out from under her throwing her violently and with great force to the cement pavement;" that her injury was caused solely and only by the negligence of the defendants "in not exercising reasonable care and prudence to keep the said ramp or passage way safe for the plaintiff and the public invited to use the same."

In considering a motion for a directed verdict the law is well settled. In *Moncrief v. Interstate Transit Lines*, 129 Neb. 168, 261 N. W. 163, this court held: "A motion for a directed verdict must, for the purpose of a decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, and said party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the facts in evidence."

Applying the foregoing holding to the instant case, the burden of proof, by a preponderance of the evidence to prove negligence, is on the plaintiff as reflected by our holding in *Miller v. Abel Construction Co.*, 140 Neb. 482, 300 N. W. 405, as follows: "In an action for negligence, the burden is on the plaintiff to show that there was a negligent act or omission by the defendant and that it was the proximate cause of plaintiff's injury or a cause which proximately contributed to it."

The burden of proof is upon the plaintiff, in a personal

injury action, to establish that some of the acts charged in the petition are the proximate cause of the injury of which the complaint is made. In this connection, this court held in *Rankin v. J. L. Brandeis & Sons,* 135 Neb. 86, 280 N. W. 260: " 'The proprietor of a store is not an insurer against accidents to customers, but is bound to exercise reasonable care and prudence to keep the premises, which the public is tacitly invited to use, safe for that purpose.' *Glenn v. Grant Co.,* 129 Neb. 173, 260 N. W. 811."

In the instant case, the plaintiff suffered a fall, the cause of which is not known to her or to any one else. There is no evidence that the mat was in any way misplaced after the fall, or that it was not in the same position as when the plaintiff entered the store. She was not stepping on or off the mat at the time she fell; nor was she close to the corners of the mat, but she was nearing the end, intending to turn to the west. This does not support her allegation that the edges of the mat were worn and curled upward. There is no evidence that there were any depressions or raised places or defects of any kind in the mat, nor evidence that the mat slid from east or west, as she had not made the turn. She did not know which foot caught, or exactly what happened.

The plaintiff has failed to establish by the evidence that the negligence of the defendants was the proximate cause of her injury. The trial court could not escape the necessity of directing a verdict for the defendants in the case at bar. If it had allowed the case to go to the jury and a verdict had been returned for the plaintiff, the court would have been compelled to set it aside on the motion for a new trial, because of the failure of the plaintiff to prove actionable negligence. See *Smith v. Epstein Realty Co.,* 133 Neb. 842, 277 N. W. 427.

The evidence fails to disclose the cause of the plaintiff's fall. We can only surmise and speculate as to its cause, and a verdict cannot be based on mere speculation or conjecture. As held in *Bowers v. Kugler,* 140 Neb. 684, 1 N. W. (2d) 299:

"Negligence is not presumed; the mere happening of an accident does not prove negligence.

"The burden of proving a cause of action is not sustained by evidence from which negligence can only be surmised or conjectured."

We conclude from an analysis of the record and the authorities as set out herein that the action of the trial court in directing a verdict in favor of the defendants is correct.

AFFIRMED.