THOMAS SHIELDS, ADMINISTRATOR OF THE ESTATE OF ROBERT SHIELDS, DECEASED, APPELLEE, V. COUNTY OF BUFFALO ET AL., APPELLANTS.

71 N. W. 2d 701

Filed August 19, 1955. No. 33704.

*Robert L. Haines, Hamer, Tye & Worlock,* and *Blackledge & Sidner,* for appellants.

*Munro & Parker,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

Thomas Shields, as administrator of the estate of Robert Shields, deceased, brought this action in the district court for Buffalo County against the County of Buffalo, Douglas Anstine, and George Sobotka. The action is brought under and pursuant to the authority of sections 30-809 and 30-810, R. R. S. 1943, often referred to as Lord Campbell's Act, is for the exclusive benefit of the next of kin of the deceased, and is based on alleged acts of negligence claimed to have been the proximate cause of the death of Robert Shields and for which it is contended defendants are liable.

Issues were joined and trial had. Plaintiff recovered a verdict against all of the defendants in the sum of $10,931.65. Each of the defendants separately filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. These motions also included a request that in case both the foregoing were denied that the court reduce the amount of the verdict by requiring a remittitur because the verdict is excessive. The court overruled all of these motions and the defendants have appealed therefrom.

We will separately discuss the issues raised by the county but discuss those raised by Anstine and Sobotka together for Anstine was an employee of Sobotka and admittedly engaged within the scope of this employment at the time of the accident.

A person is liable for the negligent operation of an automobile by his servant where such servant, at the time of the accident, was engaged in his employer's business with the latter's knowledge and consent. Shaffer v. Thull, 147 Neb. 947, 25 N. W. 2d 755.

The accident in which Robert Shields was killed happened shortly before 11 p. m. on Friday, July 3, 1953, on a county road some 6½ miles south of Ravenna, Nebraska, and just south of what is referred to in the record as the Zeller bridge. Robert Shields was, just before the accident, driving his father's 1950 Oldsmobile sedan north on this county road, which road was built and is maintained by Buffalo County and referred to in the record as the Ravenna road, it running straight south from that city. At the same time Anstine was driving his 1949 Lincoln sedan on this road. At a point about 70 feet south of the Zeller bridge, which bridge is on the Ravenna road and was built and is maintained by Buffalo County, the Lincoln sedan hit the Oldsmobile sedan and killed four of the five teenagers riding therein, the fifth miraculously and fortunately survived. Robert Shields was 16 years of age at the time. We will

discuss the facts in more detail in connection with our discussion of the questions raised.

In considering several of the questions hereinafter discussed the following principles are applicable:

"A motion for directed verdict or for judgment notwithstanding the verdict must, for the purpose of decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference that can reasonably be deduced from the evidence." Stark v. Turner, 154 Neb. 268, 47 N. W. 2d 569.

"In an action where there is any evidence which will support a finding for a party having the burden of proof, the trial court cannot disregard it and direct a verdict against him." Stark v. Turner, *supra*.

"In a law action, where the case is presented to the jury under proper instructions, a verdict based upon conflicting evidence will not be set aside on appeal unless clearly wrong." Remmenga v. Selk, 150 Neb. 401, 34 N. W. 2d 757.

"In testing the sufficiency of evidence to support a verdict it must be considered in the light most favorable to the successful party, that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can reasonably be deduced therefrom." Remmenga v. Selk, *supra*.

"It is not the province of this court in reviewing the record in an action at law to resolve conflicts in or weigh the evidence." Snyder v. Farmers Irr. Dist., 157 Neb. 771, 61 N. W. 2d 557.

"It is presumed in such an action that controverted facts were decided by the jury in favor of the successful party, and its finding based on conflicting evidence will not be disturbed unless clearly wrong." Snyder v. Farmers Irr. Dist., *supra*.

Insofar as Buffalo County is concerned, the court submitted the following specifications of negligence:

"8. That the defendant County of Buffalo carelessly and negligently failed to maintain a sufficient bridge at said place on said county road in the following particulars:

"(a) In failing to maintain said bridge so that it was fit for public traffic to cross the same.

"(b) In failing to maintain a guide rail to prevent vehicles from running into the batter chord of said bridge.

"(c) In permitting said bridge to become out of repair.

"(d) In failing to replace said bridge when the defendant County of Buffalo knew or should have known that said truss type bridge was out of plumb.

"(e) In failing to warn the public that said bridge was narrower than the roadway approaching the bridge.

"(f) In failing to warn the public and particularly the defendant Douglas Anstine that the northwest batter chord was bent to the east.

"(g) In maintaining said bridge when it was old, rusty and obsolete and not fit for modern traffic and heavy loads that used said county road and bridge.

"(h) In failing to warn the public and particularly the defendant Douglas Anstine that the upper truss or banister was bent over the bridge floor."

The county contends it was prejudicial error for the trial court to include specifications of negligence in the foregoing instruction which find no support in the evidence.

"It is the duty of the trial court to present to the jury those issues which are raised by the pleadings and which find support in the evidence." Oliver v. Oliver, 159 Neb. 218, 66 N. W. 2d 420. See, also, Franks v. Jirdon, 146 Neb. 585, 20 N. W. 2d 597.

"In stating the issues to the jury it is error, which may be prejudicial, for the trial court to include allegations

of which there is no proof." Oliver v. Oliver, *supra*.

In this respect it is likewise error to submit an issue of negligence in regard to a matter where no duty is owing. This latter has application to specifications (b) and (e). We held in Olson v. County of Wayne, 157 Neb. 213, 59 N. W. 2d 400: "A county is not obligated to erect and maintain safety warning signs along its highways apprising the public of conditions such as curves, turns, location of bridges, and similar situations that may be hazardous, unless the duty to exercise reasonable and ordinary care in the maintenance of its highways requires it to do so at a particular location." We went on in the opinion to say: "There is no requirement of law that a county erect and maintain safety warning signs of conditions such as curves, turns, locations of bridges, and the like, unless the duty to do so at a particular location is dictated by reasonable and ordinary care in the maintenance of its highway."

Appellee contends the trial court, by instructions Nos. 21 and 22, submitted the foregoing proposition to the jury as a question of fact and that no error occurred by its doing so, stating: "It cannot be said, in view of this evidence, that as a matter of law, there was no duty to maintain signs or guide rails."

The evidence adduced as to the bridge, and the situation existing there, discloses the following: It was a compression type of bridge with steel frame and wooden bed or floor that was covered with gravel; the bridge was about 40 feet long and 16 feet wide, the metal part of which was rusty in appearance; the graveled and maintained portion of the road immediately to the north was 24 feet wide; there were no guide rails at the approach where the road narrows from 24 feet to the width of the bridge; there were no signs to warn a traveler of the fact that the bridge was narrower than the road itself; and there were some weeds and grasses growing in the ditch to the west and some, including sumac, growing in the creek or ravine over which the bridge extended

but there was nothing in the road that would have prevented any oncoming traveler from the north from seeing the bridge, as the road to the north is straight and slopes up only slightly from the bridge to a small knoll some 350 to 450 feet away.

Under this factual situation there was no duty on the part of the county to maintain guide rails at the approaches to the bridge nor to put up signs to warn the public that the bridge was narrower than the road approaching it. We find the submission of these two specifications was, under the circumstances shown, error, as it permitted the jury to speculate in regard thereto.

Appellee alleged the county was obligated to maintain and keep this bridge in repair. Specifications (a), (c), (d), (f), (g), and (h) relate to this duty, the county's failure to perform it, and its failure to warn the public in regard thereto.

"There was not at common law a right of action against a county for the recovery of damages resulting from a defective highway or bridge. The source and extent of liability of a county in this state for damages of this character are statutory." Olson v. County of Wayne, *supra*.

Section 39-834, R. R. S. 1943, insofar as here material, provides: "If special damage happens to any person, his team, carriage or other property by means of insufficiency or want of repair of a highway or bridge, which the county or counties are liable to keep in repair, the person sustaining the damage may recover in an action against the county, * * *."

"The word insufficiency in the statute referred to in the opinion means inadequate to the need, use, or purpose of the highway." Olson v. County of Wayne, *supra*.

"The word repair as used in the road laws means to restore to a sound or good condition after decay, injury, dilapidation, or partial destruction." Olson v. County of Wayne, *supra*.

As stated in Olson v. County of Wayne, *supra:* "A

county is obligated to use reasonable and ordinary care in the construction, maintenance, and repair of its highways and bridges so that they will be reasonably safe for the traveler using them while he is in the exercise of reasonable and ordinary caution and prudence. The duty of the county will not be extended by construction beyond the words and fair implication of the statutory liability. A county is not an insurer of the safety of a person who uses its roads and bridges or the safety of the highways and bridges maintained by it for the use of the public." See, also, Wittwer v. County of Richardson, 153 Neb. 200, 43 N. W. 2d 505.

"In an action to recover damages from a county by virtue of the statute the burden is on the plaintiff to establish negligence of the county and that the negligence was the proximate cause of the injury or that it was a cause that proximately contributed to it." Olson v. County of Wayne, supra. See, also, Bowerman v. Greenberg, 142 Neb. 721, 7 N. W. 2d 711.

" 'Negligence is not presumed; the mere happening of an accident does not prove negligence.' Bowers v. Kugler, 140 Neb. 684, 1 N. W. (2d) 299." Bowerman v. Greenberg, supra.

" 'The burden of proving a cause of action is not sustained by evidence from which negligence can only be surmised or conjectured.' Bowers v. Kugler, 140 Neb. 684, 1 N. W. (2d) 299." Bowerman v. Greenberg, supra.

The bridge involved had been used for many years. The trusses on each side of the floor of the bridge, and which were the supports thereof, consisted of three panels or parts. One was the horizontal panel on top, the other two were the sloping panels at each end, referred to as batter chords. The latter were anchored at the corners of the bridge by shoes. These shoes were riveted to caps or crossbeams attached to steel piling located at each end of the bridge. The bridge had a carrying capacity of 17 to 25 tons.

William G. Spahr, who was bridge superintendent for

the county in 1952, testified that his duties as such consisted of supervising and constructing bridges for the county; that when he examined this bridge he found the trusses were beginning to lean; that because of various factors the beams or trusses would not stay straight or plumb; that he thought the bridge ought to be replaced and ordered steel for that purpose; and that the last time he inspected it the lean was about ˚15°. However he also testified that the last time he inspected this bridge, which was shortly before January 1, 1953, that the needle beams had dropped a little but had not gone down far enough to affect the floor of the bridge; that the floor of the bridge was then level; and that the lean had not gone far enough to hurt anything. The only evidence as to the effect of a 15° lean of the trusses is that it would decrease the carrying capacity of the bridge somewhere between 5 to 10 percent and that it would not otherwise affect the stability thereof.

The evidence shows the road on which the accident happened is a well-traveled graded and graveled county road; that trucks and semitrailers carrying loads up to 700 or 800 bushels of grain and up to 11 tons of gravel used this road frequently. In fact, the evidence shows it was so used very shortly before the accident occurred and that no one using it for such purposes became aware of the fact that the bridge was in any way defective, if in fact it was. We find no evidence which would support a finding that the county did not use reasonable and ordinary care in the maintenance and repair of this bridge so that it would be, and was, reasonably safe for the traveling public.

But let us assume, for the sake of discussion, that the county was negligent in this regard. That fact alone would not make it liable for, as stated in the authorities quoted, such negligence would have to be established as the proximate cause of the accident or that it was a cause that proximately contributed thereto. As stated in Kennedy v. Chicago, R. I. & P. R. R. Co., 156 Neb.

345, 56 N. W. 2d 446: "Negligence which is the moving and effective cause of a happening is the proximate cause thereof."

The evidence shows that when the north end of the bridge collapsed the northwest batter chord of the bridge, which had been torn loose from its footing, was found under the wooden timbers of the floor or bed of the bridge; that this batter chord was bent downward into a "V" shape from a severe blow on the upperside or top thereof whereas it would have been bent upward had the bridge collapsed from an overload or overweight; and that the tearing loose of the footing of any batter chord would cause the bridge to collapse. The evidence shows that is what happened. Under this situation we can see no possible connection between the leaning of the trusses and the collapsing of the bridge. Such leaning was at most, under the circumstances here shown, a condition.

In this respect we have not overlooked the fact that Anstine testified he saw either the batter chord or handrail leaning in when he was about 25 feet from the bridge. At that time he admits he was traveling not less than 40 miles an hour and did not have time to apply his brakes in the fraction of a second after he saw it and before he hit the bridge. He said he was driving with his courtesy lights on, being blinded by the lights of an oncoming car, and that he did not see the handrail until it showed up white in his lights, which lights extended out about 25 to 30 feet.

" '* * * It was the duty of the driver of the car after dark on this road to proceed so that his headlights would mark out the traveled road * * *.' (Tomjack v. Chicago & N. W. Ry. Co., 116 Neb. 413, 217 N. W. 944.)" Olson v. County of Wayne, *supra*.

Of course the bright lights of any oncoming car would not excuse Anstine for we have often said a driver of a car must drive it so he can stop within the radius of his lights and that: "The existence or presence of smoke,

snow, fog, mist, blinding headlights, or other similar elements which materially impair or wholly destroy visibility are not to be deemed intervening causes but rather as conditions which impose upon the drivers of automobiles the duty to assure the safety of the public by the exercise of a degree of care commensurate with such surrounding circumstances." Haight v. Nelson, 157 Neb. 341, 59 N. W. 2d 576.

What is said in Olson v. County of Wayne, *supra,* has application here. Therein we said: "The guardrail or its condition could not have been the proximate cause of the accident. The driver of the car stated that his vision of the road in front of the vehicle was restricted to 25 feet, and that he did not see the bridge or anything about it until he was within 25 feet of the bridge. The minimum rate of speed at which the car was traveling at that time was at least 40 miles an hour. The time that elapsed between when he first saw the bridge and when the car went over the side of the bridge was obviously less than one-half of a second. The most perfect and appropriate bridge railing could not have been a factor in avoiding the accident under these circumstances."

We have come to the conclusion that the evidence adduced fails to show the county was guilty of any act which would constitute negligence. But assuming that permitting the trusses of the bridge to lean, which the evidence shows they did, was negligence, we find no evidence to show that it in any way contributed to the accident by being a proximate cause therefor or a cause that proximately contributed thereto. It was merely a condition that in no way related to the accident which caused the death of Robert Shields. We find the trial court was in error in submitting the issue of the county's liability to the jury and should have sustained its motion for a judgment notwithstanding the verdict.

As to Anstine the court submitted the following specifications of negligence:

"9. The careless and negligent acts of the defendant, Douglas Anstine, in which the defendant George Sobotka participated are as follows, to-wit:

"(a) The defendant failed to maintain proper control of his vehicle and failed to prevent the same from running into and against said bridge.

"(b) The defendant failed to maintain a proper lookout for other vehicles on said highway at said time and place and particularly for the vehicle which Robert Shields was driving.

"(c) The defendant failed to keep a proper lookout for narrow bridges on said highway, although he was familiar with said road and bridges.

"(d) The defendant was driving at said time and place at night on a graveled road approaching a bridge and approaching other vehicles and was operating his vehicle at a rate of speed greater than was reasonable and proper under such circumstances.

"(e) The defendant was operating said vehicle at a rate of speed greater than provided by law.

"(f) In failing to apply his brakes in time to avoid collision with said bridge and the vehicle driven by the decedent, Robert Shields.

"(g) In driving and operating his vehicle on the wrong side of said road and into and upon the vehicle driven by Robert Shields."

As already herein set forth, in stating the issues to the jury, it is error, which may be prejudicial, for the trial court to include allegations of negligence which find no support in the proof. Anstine, on the basis that appellee alleged specific acts of negligence and consequently the doctrine of res ipsa loquitur has no application (see Mischnick v. Iowa-Nebraska Light & Power Co., 125 Neb. 598, 251 N. W. 258; Security Ins. Co. v. Omaha Coca-Cola Bottling Co., 157 Neb. 923, 62 N. W. 2d 127), contends the circumstances shown are not sufficient to establish any of the acts of negligence alleged.

The principles applicable in civil cases are as follows:

"In testing the sufficiency of evidence to support a verdict it must be considered in the light most favorable to the successful party." Taylor v. J. M. McDonald Co., 156 Neb. 437, 56 N. W. 2d 610.

"It is often impossible to prove the existence of certain situations by positive and direct evidence. When one faces that situation, he may resort to the doctrine announced in Union P. R. Co. v. Erickson, 41 Neb. 1. It is there held in a situation similar to this: 'While the facts justifying an inference of negligence must be established by the evidence and their existence, must not be left to the conjecture of a jury, and while ordinarily negligence cannot be presumed merely from the happening of an accident, still facts may be established by circumstances, and the same facts which prove the accident may be circumstances from which the facts justifying an inference of negligence may be found to exist.' " Weber v. Thompson-Belden & Co., 105 Neb. 606, 181 N. W. 649.

"Negligence is a question of fact and may be proved by circumstantial evidence and physical facts. All that the law requires is that the facts and circumstances proved, together with the inferences that may be properly drawn therefrom, shall indicate with reasonable certainty the negligent act charged." Gilliland v. Wood, 158 Neb. 286, 63 N. W. 2d 147. See, also, Rocha v. Payne, 108 Neb. 246, 187 N. W. 804.

Anstine, a salesman for Sobotka, testified he completed his work in Ravenna shortly after 10 p. m. on the evening of July 3, 1953; that he then proceeded to drive south out of Ravenna on the Ravenna road, intending to return to his home in Kearney; that he was driving his 1949 Lincoln sedan; that he only passed one car before reaching the bridge, doing so about 2 miles north thereof; that he was then driving from 40 up to 45 miles an hour, driving about 50 as he approached the bridge; that as he approached the bridge a car with bright headlights was coming from the south, the road

south of the bridge is, for a considerable distance, straight and level; that he put on his courtesy lights and then flicked his lights from courtesy to bright three or four times trying to get the oncoming car to dim its lights but was not successful in doing so; that he left his lights on courtesy, which gave him a beam of light ahead of 25 to 30 feet; that as he approached the bridge from the knoll to the north he took his foot off of his accelerator but did not apply his brakes; that his car did not slow up; that he continued to drive on the right side of the road, not realizing there was a bridge immediately ahead; that suddenly, just an instant before the accident, he saw either the northwest batter chord or handrail of the bridge in the beam of his lights; that what he saw was white and appeared to be leaning to his left or east; that in the fractional part of a second, which he estimated at less than a half second, he was not able to put on his brakes or to avoid hitting whatever it was that was ahead of him; that after his car hit the handrail, or whatever it was, it went down with an awful bump; and that was the last he remembers until the accident was over and he was in his car which was lying on its left side.

John W. Schuller, who was the first person at the scene of the accident, testified he was driving his car south on the Ravenna road that evening very shortly before the accident; that Anstine's car passed him about 1½ miles north of the bridge; that he (Schuller) was at that time driving about 45 miles an hour; that outside of having to slow up momentarily when the Anstine car passed him, because of the dust and gravel which it kicked up, he continued at that speed; that the night was quiet and clear, the road dry, and visibility good; that when he got to the Wedemeyer mail box, a point about a half mile north of the bridge and from which point one can see cars approaching the bridge from the south, he did not then or thereafter see any car lights approaching from that direction; that he saw the An-

stine car in the road when he came over the first rise in the road north of the bridge, which rise is about 350 to 450 feet to the north thereof; that the Anstine car was then lying in the road south of the bridge, which was collapsed; that it was lying on its side facing east; and that Anstine was in it trying to get out.

Outside of what Anstine testified to there is no other testimony by anyone who was involved in the accident or saw it as Lee Etta Cash, the only survivor of the five passengers in the Shields car, had no recollection of anything that happened after she got into the Shields car in Kearney. However, there is evidence of the physical facts that were evident to those who came upon the scene shortly after it had happened.

The northwest batter chord of the bridge was introduced in evidence. This heavy steel beam was bent downward in a sharp "V", tearing the steel side walls thereof in doing so. The evidence shows that at the time of the accident 6 rivets on the face of this batter chord, 2 below and 4 above the bend of the "V", together with the inside edge thereof, were freshly scraped and battered. The right half of the front bumper of the Anstine car was also introduced in evidence. This bumper has a series of grooves, which the evidence shows were freshly made at the time of the accident, and is bent in a manner that it is clearly evident what hit the batter chord. As hereinbefore stated the batter chord was torn loose from its footing where it is fastened by a shoe, which had been riveted to the cap or steel cross beams which, in turn, were fastened to the steel piling at the north end of the bridge. There is evidence in the record to the effect that when that happens the bridge will collapse and the evidence shows that is exactly what happened to the north 10 feet thereof, the northwest batter chord being found under the wooden joists and planks of the bed or floor of the bridge.

The evidence also shows the south end of the floor

did *not go down so the south* 30 feet thereof sloped up from the bed of the creek or ravine, over which the bridge was constructed, to the level of the road at the south end thereof. On this floor or bed, which was covered with gravel, was a mark some 2½ to 3 feet wide extending some 25 feet on the floorbed and then 8 feet on the road beyond. At that point it stopped and there were no marks of any kind on the road from there to an indentation or scraped out place about 62 feet south thereof. The Anstine car, as it lay in the road on its side, was about 71 or 72 feet south of the south edge of the bridge and was badly damaged on both sides and on its top. It is significant that it had paint on its left side of the same color as the Shields car.

Immediately north of the Anstine car was an indentation or scraped out place in the road and scattered on the surface of the road around this indentation were pieces of glass and metal from both cars.

The Shields car was found east of the bridge in the bed of the creek or ravine with its top crushed down toward the rear. There was no sign of any damage to it below the horizontal line of the front bumper. Significant is the fact that the evidence shows this car had marks on the top and paint therein of the same color as the Anstine car. The tire tracks of the Shields car were traced back to where its front wheels had skidded or been shoved sidewise some 8 to 10 inches, which skid marks were on the east half of the road and to the north of where the Anstine car stopped on its side. The Shields car stopped about 126 feet northeast of the indentation mark on the road. It was on its wheels and facing east-southeast.

We come then to a discusison of whether or not the trial court was in error in submitting, as to Anstine, the several specifications of negligence which have hereinbefore been set forth.

As to specifications (a), (b), (c), (d), (f), and (g) little need be said because the evidence herebefore set

forth fully supports submitting these to the jury. These facts indicate, with reasonable certainty, that Anstine was, at the time, driving his car south on the Ravenna road at such a rate of speed that he did not observe the bridge until it was too late for him to either brake his car to avoid hitting the bridge or to turn it for that purpose; that his car, weighing over 2 tons, hit the northwest batter chord of the bridge with enough force to bend it into a "V" shape and tear it loose from its footing thus causing the bridge to collapse when his car, which went to the left, hit the floor thereof; that the Anstine car then traveled up the floor or bed of the bridge, and a short distance beyond, when it went into the air; that some 62 feet to the south it hit the Shields car on top with its left side, crushing the top thereof down and toward the back; and that the Shields car was on its right or east side of the road.

As to specification (e) we will assume, for the purpose of discussion, that this specification specifically relates to the 50 miles per hour maximum for driving at night, although the statute is much more restrictive as is evidenced by the following from section 39-723, R. R. S. 1943, of which it is a part: "* * * at a rate of speed greater than is reasonable and proper, having regard for the traffic and use of the road and the condition of the road, nor at a rate of speed such as to endanger the life or limb of any person, * * *." As to the quoted language the evidence would clearly justify submitting this specification to the jury.

Before proceeding to dispose of this issue we shall dispose of Anstine's contention that the court erred in overruling his objection to the testimony of John W. Schuller, which testimony has already been herein set forth. Anstine contends that the evidence of speed at the point where he passed Schuller, a mile and one-half north of the bridge, was manifestly too remote to have any competent evidentiary value as to Anstine's speed at or immediately prior to the time of the accident.

That is undoubtedly true but it will be observed that Schuller did not testify as to how fast Anstine was going but as to the fact that Anstine passed him and where, how fast he (Schuller) was going at the time, how fast he continued to go thereafter, and the fact that when he got to the Wedemeyer mail box, about a half mile from the bridge, there were no lights on the road and as he proceeded on he found the results of the accident.

"This question of the admissibility of the speed of a vehicle shortly prior to the time of the accident rests largely in the discretion of the court." Schwarting v. Ogram, 123 Neb. 76, 242 N. W. 273, 81 A. L. R. 769. We also said therein: "That when the machine was going at an excessive rate of speed a mile from the place where the collision occurred, and the speed did not slacken until after the collision, this evidence should be admitted."

"The rule of these cases is hereby approved but the discretion therein contemplated does not permit the admission of evidence of speed at other points unless the points are of such close proximity that a reasonable inference could be drawn that it was continued to the point of the accident, or unless, if more remote, there is evidence of fact or circumstance from which a reasonable inference could be drawn that speed was continued at approximately the same rate over the intervening distance." Prince v. Petersen, 144 Neb. 134, 12 N. W. 2d 704.

"Various factors, such as skid marks, distance traveled after impact, and force of impact, constitute pertinent evidence in arriving at an estimate of the rate of speed of an automobile, either by those involved in an accident or those in authority investigating the accident immediately thereafter. See 5 Am. Jur., Automobiles, § 630, p. 850." Koutsky v. Grabowski, 150 Neb. 508, 34 N. W. 2d 893.

It is true Anstine testified he did not exceed 50 miles

an hour but he testified he maintained the same speed from where he passed the Schuller car until he reached the bridge. The evidence shows Schuller reached the Wedemeyer mail box, about a half mile from the bridge, when it is apparent the accident had already taken place. The batter chord that the Anstine car hit is in evidence and it is self-apparent it was hit with terrific force. There is also the fact that the jury could reasonably find the Anstine car hurtled through the air some 60 feet before it landed on top of the Shields car. There is no question but what the jury could very properly find that Anstine was driving far in excess of 50 miles an hour when he hit the bridge.

In any event we think what was said in Advance-Rumely Thresher Co. v. Bartzat, 114 Neb. 35, 206 N. W. 7, is here applicable. Therein we said: "* * * we conclude that reversible error cannot be predicated upon this assignment, since the verdict of the jury is the only one which should have been returned under the testimony."

Anstine contends that funeral expenses cannot be recovered in the absence of proof that they represent the fair and reasonable value of the materials furnished and services rendered.

We said in Becker v. Hasebrock, 157 Neb. 353, 59 N. W. 2d 560: "Funeral expenses cannot be recovered in the absence of proof that they represent the fair and reasonable value of the materials furnished and the services rendered." See, also, Oliverius v. Wicks, 107 Neb. 821, 187 N. W. 73.

In discussing this issue in Becker v. Hasebroock, *supra,* we said: "The record shows that the funeral expenses were paid by the wife of the decedent in the amount of $775.95. The only evidence relating thereto was the receipted statement of the undertaker which was received in evidence over the objection of the defendant. There was no evidence of the fair and reasonable value of the materials furnished or the services

rendered. Such proof is essential to a recovery. The objection to the admission of the receipted statement should have been sustained."

The evidence here adduced in this respect is that of Thomas Shields, the father. He testified as follows: "Q I have one further question that I should have asked on direct. Mr. Shields, I neglected to inquire about the funeral expenses. Have you paid the funeral expenses? A We have. Q And what did that amount to? A $931.65, if I'm not mistaken. (examining paper). $931.65."

It will be observed no objection was made to this testimony in the form in which it was offered. In the absence thereof, we think the following applies: If proof is offered of what was paid for materials furnished and service rendered in conducting a funeral, and no objection is made thereto on the ground that the amount so paid is not the proper basis for recovery, it will be presumed the objection thereto on that basis is waived and that the amount so paid is the fair and reasonable value thereof.

We come then to the question, was a verdict of $10,000 excessive? This court has laid down certain principles applicable here.

In Fisher v. Trester, 119 Neb. 529, 229 N. W. 901, we said: "The measure of damage in an action by the personal representative of a child, for the benefit of its parents, to recover for wrongfully causing the death of such child, is the present worth in money of the contributions having a general monetary value of which the parents are shown by the evidence with reasonable certainty to have been deprived by the act causing the death, and those contributions that are only probable, or conjectural, may not be included in the amount of such damage."

And, as stated in Dorsey v. Yost, 151 Neb. 66, 36 N. W. 2d 574, 14 A. L. R. 2d 544: "The measure of damages in an action such as we have before us is the pecuniary loss which the parent sustains by reason of being de-

prived of the child's services during his minority and the loss of contributions that might reasonably be expected to be made after reaching his majority. Contributions which are speculative or conjectural may not properly be included. It is for the jury to determine the pecuniary value of the child's services which would have accrued to the parent but for the accident. The amount to which a parent is entitled cannot be accurately determined because of the numerous contingencies involved. The amount being very problematical, it is peculiarly for the jury to determine, after hearing all the evidence bearing upon the situation, including the parent's position in life, the physical and mental condition of the child, his surroundings and prospects, and any other matter that sheds light upon the subject. Members of juries generally have children of their own and have information as to the pecuniary value of children's services and the expense involved in their care and education. A jury is peculiarly fitted to determine the loss sustained by a parent in such a case. At best, the verdict can only be an approximation as no yardstick exists by which the correct answer can be found with exactness."

The evidence shows that Robert Shields was 16 years of age on December 19, 1952; that he was a good student and had just completed his junior year in the high school of Kearney; that he intended to return the following year to complete his high school education; that he lived with his parents, Thomas and Wanda Shields; that he was an ambitious and capable young man, getting outside employment whenever he could do so; that in the summer of 1952 he worked for Willis Shields, no relation, at the Western Motel in Kearney; that he again had the same job in the summer of 1953 and was working there at the time of his death; that when working full time, which he did during his summer vacations, he was earning $35 a week; that he also worked at this place on Saturdays and occasionally on Sundays in the early spring

and late fall while attending school; that he was an able young man fully capable of handling the motel's business which consisted of running a filling station and the renting of cabins; that he was, on occasions, left in full charge thereof; that he used what he earned to buy himself clothes and other things he needed, including spending money and some of his incidental expenses in school; that while he was attending school he willingly helped his mother around the home doing anything she wanted him to do, including mowing the yard, scooping the snow etc., putting in about 1½ to 2 hours a day or from 10 to 12 hours a week at such services; that such services were reasonably worth $1 an hour; that he bought some things for the home, the exact items or the value of such purchases not being shown; and that he was a capable, ambitious, and industrious young man who seemed to be interested in his own and his family's welfare.

Thomas, the father, was 43 years of age and, under the Commissioner's Table, had a life expectancy of 27.62 years. At the time he was regularly employed, and had been for some time, by the Army Store as a clerk and drawing $60 a week. Wanda Shields, the mother, was 39 years of age and, under the Commissioner's Table, had a life expectancy of 30.08 years. She was at the time employed by Montgomery Ward in Kearney as a credit manager at the rate of $35 per week. The parents have no real estate or other property and seem to be entirely dependent upon their income.

In considering the amount of a verdict it is proper for this court to consider the fact that the jury, in arriving at its verdict, could properly have taken into consideration the low purchasing power of the dollar, for, as stated in Johnson v. Schrepf, 154 Neb. 317, 47 N. W. 2d 853: "The period of inflation now existing is a factor which the jury could consider in arriving at the amount of the verdict. We must assume that the jury gave consideration to this fact, as it had a right to do." See,

also, Segebart v. Gregory, 160 Neb. 64, 69 N. W. 2d 315. However, as stated in Segebart v. Gregory, *supra:* "It is not a proper subject for an instruction."

Also, as stated in Johnson v. Schrepf, *supra:* "The fixing of the damages is the function of the jury and unless it can be shown to be so exorbitant as to indicate passion, prejudice, mistake, or a complete disregard of the law and the evidence, its judgment will be sustained."

While we think the jury's verdict is very ample, considering all of the facts, we do not think it is so disproportionate as to say that it must have been the result of either prejudice or passion. In view thereof it is not within our right to disturb it.

In view of the foregoing we reverse the judgment of the trial court insofar as it overruled Buffalo County's motion for a judgment notwithstanding the verdict and remand the cause to the district court with directions to sustain such motion and to enter judgment accordingly. On the other hand we affirm its action in overruling the motions of Douglas Anstine and George Sobotka to the same effect and in entering judgment against each of these defendants for the full amount of the verdict. All costs are to be taxed against Anstine and Sobotka.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.