Joan BUDDEN, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. CV88–L–493.

United States District Court, D. Nebraska.

July 11, 1990.

C.L. Robinson, Fitzgerald, Schorr, Barmettler & Brennan, Michael F. Kinney, Cassem, Tierney, Adams, Gotch & Douglas, Omaha, Neb., for plaintiffs.

Thomas K. Pfister, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C. (Bill Gallo, Litigation Div., FAA, Washington, D.C., Ronald Lahners, U.S. Atty., Sally Johnson, Asst. U.S. Atty., Lincoln, Neb., of counsel), for defendant.

## MEMORANDUM OF DECISION

URBOM, District Judge.

This action arises from the crash of a helicopter ambulance en route from Kearney, Nebraska, to Ainsworth, Nebraska, on December 20, 1985. The pilot of the helicopter was Craig Budden, employed by Ronald P. Rodgers, d/b/a Rodgers Helicopter Service (Rodgers). The aircraft was a Bell 206L helicopter, bearing the registration number N110LG and owned by Rodgers. Also on board were two flight nurses, Nancy Brandon and Joan Brown, who were employed by Good Samaritan Hospital in Kearney, Nebraska. At the time of the accident N110LG was being operated by Rodgers Helicopter Service pursuant to a contract with Good Samaritan Hospital, as a flight under the hospital's emergency medical service Air Care Flight Program. The helicopter crashed approximately 20 miles south of Ainsworth, Nebraska, killing all three persons. The estates of Brandon and Brown have previously brought suit against Rodgers and the estate of Budden for alleged negligence. Associated Aviation Underwriters (AAU) defended those cases as the liability carrier for Rodgers. Budden, as pilot, was an additional insured under the liability policy. These cases were settled by payment to the estates of Brandon and Brown. Following the settlements, AAU, Rodgers, and Joan Budden and Wilma Lewis, personal representatives of the estate of Craig Budden, deceased, filed the present claim against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671–2680. Aetna Life and Casualty joined in the complaint by way of subrogation to the rights of Rodgers and the estate of Budden to recover workers compensation payments made arising from the death of Budden. The plaintiffs allege that the negligence of the Federal Aviation Administration (FAA) in failing through Robert Geranis to provide complete weather information was a proximate cause of the accident.

### I.

#### Evidentiary Issues.

1. The NTSB Report.

At trial the defendant offered Exhibit 110, a portion of the report of the National Transportation Safety Board (NTSB). The plaintiffs objected, based on 49 U.S.C.App. § 1441(e), which states that: "No part of any report or reports of the National Transportation Safety Board relating to any accident or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports."

The defendant argues that § 1441(e) precludes only the admission of the NTSB's conclusions and probable cause findings, and that the factual portion of the report is admissable. Three cases are cited as support for this proposition: *Mullan v. Quickie Aircraft Corp.*, 797 F.2d 845 (10th Cir. 1986) (Section 1441(e) excludes only the parts of the NTSB reports that contain agency conclusions on the probable cause of accidents; district court did not err in allowing plaintiff's expert witness to rely on factual portions of an NTSB report); *Curry v. Chevron*, 779 F.2d 272 (5th Cir. 1985) (District court properly allowed expert witness to testify to conclusions based on factual data in an NTSB report, and

properly forbade the expert's use of the opinions and conclusions contained in the report); and *American Airlines, Inc. v. United States*, 418 F.2d 180 (5th Cir.1969) (District court properly allowed into evidence two reports that were part of a Civil Aeronautics Board report because they did not reflect the Board's evaluation of the data they contained or the emphasis placed on that data in reaching a decision on probable cause).

One of the earlier cases to address the scope of § 1441(e) was *Berguido v. Eastern Air Lines Inc.*, 317 F.2d 628 (1963). At trial, a portion of the deposition testimony of two Civil Aeronautics Board (the predecessor of the NTSB) investigators was read into the record. The testimony related to the speed of the plane at the time of impact, the attitude of the aircraft just prior to impact and the angle and rate of descent. The defendant argued that § 1441(e) barred a CAB investigator from testifying to anything except his personal observations about the scene of the crash and the condition of the plane after the accident. The court disagreed and said:

> This argument blurs the essential policy and reason behind the section with other policies affecting the admissibility of evidence. The fundamental policy underlying 1441(e) appears to be a compromise between the interests of those who would adopt a policy of absolute privilege in order to secure full and frank disclosure as to the probable cause and thus help prevent future accidents and the countervailing policy of making available all accident information to litigants in a civil suit. Accordingly, the primary thrust of the provision is to exclude CAB reports which express agency views as to the probable cause of the accident. (Footnotes omitted) 317 F.2d at 631–32.

A more recent case to discuss this issue is *In re Air Crash at Stapleton Intern.*, 720 F.Supp. 1493 (D.Colo.1989), wherein the court allowed into evidence an NTSB report. Portions of the report entitled 1) Executive Summary, 2) Probable cause finding, and 3) Recommendations were excluded. The defendants argued that § 1441(e) prohibited the introduction of any portion of the report. The court disagreed and stated that:

> The legislative history of the statute demonstrates its purpose was to prevent usurpation of the jury's role by evidentiary use of the Board's conclusions as to probable cause. This purpose is served by the exclusion of conclusions regarding the probable cause of an accident presented by the Board, its investigative sub-committees or individual employees.

720 F.Supp. at 1496.

The portions of the NTSB report sought to be admitted by the plaintiffs here contain the following sections: 1) Factual report, 2) Pilot/operator aircraft accident report, 3) Witness statements 4) Weather records, 5) FAA Omaha FSS personnel statement, 6) Transcript of recorded communication, 7) FAA teardown inspection report, 8) Brown County coroner's report, 9) Statement of party representative, 10) toxicology report, and 11) photographs of the accident scene. I have reviewed the NTSB report and find that it contains no opinions or conclusions as to the probable cause of the crash.

However, the fact that the report contains no such opinions or conclusions does not mean it is automatically admissible. As pointed out in *Stapleton Intern., supra*, government reports are subject to the limitations of the public records exception to the hearsay rule as set forth in Fed.R. Evid. 803(8)(C), which exempts from the hearsay rule "Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (c) ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness". But while government accident investigation reports are generally admissible under Rule 803(8), portions of those reports may present other hearsay problems. *Stapleton Intern., supra* at 1497. Evidence reported in a government document is only admissible to the extent that the maker of the document could testify to that evidence were he or she present in court. *Stapleton Intern., supra.*

The coroner's report prepared by Brown County Sheriff Donald Brown contains statements made to him by various person; including statements regarding weather observations and sightings of N110LG just prior to the crash. (Exhibit 110, p. 59–60). Reports otherwise admissible under Rule 803(8) may not contain double hearsay, that is, recordation of otherwise inadmissible hearsay by the maker of the report. *Stapleton Intern., supra* at 1498. The hearsay portions of the coroner's report are not admissible. Therefore, the reported statements of Larry Hollenbeck, Terry Hollenbeck, Mike Kuchera, Orville Bradley and Dave Brandon will be disregarded.

2. The 1987 deposition of Barry Lloyd (Exhibit 198).

■ The defendant contends that the allegation by the plaintiffs that Geranis failed to advise N110LG of the content of the Chicago Area Forecast must fail because the plaintiffs, through their expert witness and agent, Barry Lloyd, have already conceded that the caller was given a sufficient weather briefing with regard to this weather information. In his 1987 deposition Lloyd testified that he believed that the area forecast given to the caller identifying himself as N110LG was sufficient. (Exhibit 198, p. 50–54). This, the defendant asserts, is admissible as an admission of a party-opponent under Fed.R.Evid. 801(d)(2), which states in part that:

A statement is not hearsay if—

... (2) ... The statement is offered against a party and is ...

(C) a statement by a person authorized by the party ·to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . .

In support of this argument the defendant cites *Collins v. Wayne Corp.*, 621 F.2d 777 (5th Cir.1980), wherein it was held that the district court erred in not receiving into evidence the deposition of the defendant's expert as an admission of the defendant. The suit arose out of a collision between a tractor-trailer and a bus carry-ing members of a church group. The plaintiffs were four of the injured and representatives of ten of the dead on the bus. They sued the Wayne Corporation (Wayne) for defective design of the bus. The plaintiffs submitted an interrogatory to Wayne asking for the identity of each person whom it had retained as an expert in the field of automobile collision investigation. Wayne responded that it had hired George Greene two days after the accident. The plaintiff's later took Greene's deposition. Prior to trial Wayne moved in limine to exclude Greene's testimony on the ground that Greene was a consultant whose opinions were not discoverable under Fed.R. Civ.P. 26. Greene's testimony supported the plaintiff's theory as to the speed of the vehicles, and also acknowledged that the plaintiffs' expert was perhaps the foremost authority in the country in the field of bus design.

The plaintiffs argued that the deposition was admissible as an admission under Rule 801(d)(2)(C); that is, it was a statement made by a person authorized by Wayne to make a statement concerning the subject. The district court held that the plaintiffs could not attribute Greene's testimony to Wayne as an admission.

On appeal the Fifth Circuit Court held that Greene's deposition was an admission of Wayne because Wayne hired Greene to investigate the bus accident and to report his conclusions. In giving his deposition Greene was performing the function that Wayne had employed him to perform. The court specifically noted that Greene's deposition testimony was not a binding judicial admission, and that had the district court admitted Greene's deposition as an admission, Wayne would have had the opportunity to explain why some of Greene's conclusions were not consistent with Wayne's position at trial.

The court rejected Wayne's argument that Greene was employed, not as an expert, but as a consultant whose opinion was not discoverable. The court stated that it could find no federal authority for a distinction between a consultant and an expert.

The only such distinction that I can find is in the Advisory Committee notes following Fed.R.Civ.P. 26. Rule 26(b)(4)(B) which provides in part that "A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial ..." The 1970 amendment of the Notes of the Advisory Committee contains the following explanation:

> Subdivision (b)(4)(B) is concerned only with experts retained or specially consulted in relation to trial preparation. Thus the subdivision precludes discovery against experts who were informally consulted in preparation for trial, but not retained or specially employed.

There is no dispute that Lloyd was engaged as an expert at the time of his 1987 deposition. The deposition was taken in connection with a case in which some of the plaintiffs herein were defendants in a suit brought by the estates of the two deceased flight nurses. The plaintiffs state in their supplemental trial brief that "Mr. Barry Lloyd's deposition was taken by the plaintiffs Brandon and Brown in the previous wrongful death suits as an expert on behalf of the defendants therein, who are some of the plaintiffs in this case." The plaintiffs go on to argue that Lloyd was intended as an expert on the cause of the accident and the lack of negligence of the pilot, not as an expert on flight service station operations or as a weather expert.

The reasoning of *Collins*, they contend, would have no application to a question answered by an expert outside the area of his expertise and outside the area of opinions which he has been asked to express. "Since the law does not authorize a party to strictly limit the questions which are asked of its expert, it cannot fairly regard stray opinions outside his expertise as being admissions." (Supplemental trial brief of plaintiffs, p. 4).

It cannot fairly be said that the questions asked of Lloyd were outside the area of his expertise. His answers were within the scope of his expertise as a consultant on aircraft crashes, and must be considered as such. His responses will not be considered as those of an expert on flight service stations or as a weather expert. I conclude that the statements made by Lloyd at his 1987 depositions are admissions of the plaintiffs. However, as explained in *Collins*, the statements are not judicial admissions and certainly do not have the effect of withdrawing a fact from issue. I therefore disagree with the defendant's assertion that the plaintiff's allegation that the pilot was not given sufficient information regarding the Chicago area forecast is no longer at issue. The deposition testimony of Lloyd will be considered, as will his testimony at trial that he is now of a different opinion.

■ Additionally, I find that Fed.R. Civ.P. 32 does not bar the receipt of this exhibit into evidence. Rule 32(1) states that "Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness, *or for any other purpose permitted by the Federal Rules of Evidence.*" (Emphasis supplied). As discussed above, Fed.R.Evid. 801(d)(2)(D) permits its use as an admission of the plaintiffs.

■ In the pretrial order the defendant has designated the portions of the deposition that it wants the court to consider. The plaintiffs object to the defendant's designations on the ground that the deposition was taken in a previous case brought by the estates of the deceased nurses and it is therefore hearsay. Because the testimony was given in a deposition taken in compliance with law in the course of the same or another proceeding, and because the plaintiff had an opportunity or similar motive to develop Lloyd's testimony, it is not hearsay by reason of Fed.R.Evid. 804(b)(1). The plaintiffs' objection is overruled. The plaintiffs ask that in the event their objection is overruled that the portions of the Lloyd deposition that they have designated in the pretrial order also be received into evidence. That request is granted.

3. The depositions of Larry Boles, Barry Lloyd (1989), and Michael Smith.

■ At trial the defendant offered portions of the depositions of Boles, Lloyd (1989 deposition), and Smith, which the de-

fendant said it had previously designated in the pretrial order. The plaintiffs objected on the ground that it was the plaintiffs, not the defendant, who had designated the portions of the depositions. The plaintiffs pointed out that the defendant had objected to the plaintiffs' designated portions, and that the defendant listed its alternative designated portions. The plaintiffs further stated that Magistrate Piester had sustained the defendant's objection (I am assuming that the plaintiffs are referring to the defendant's objection that the plaintiffs should not be allowed to call their own expert witnesses by deposition testimony which had been taken by the defendant) and required the plaintiffs to elect to produce the evidence by deposition or by live testimony. The plaintiffs stated that they elected to produce the witnesses by live testimony. It was the plaintiffs' understanding that the result of that choice was that neither party had any designated portions remaining.

The defendant responded that it had made its own designations, separate and apart from those of the plaintiffs.

The plaintiffs responded that if I do not sustain their objection (that is, if I do not exclude all of the deposition testimony of these three people) and allow the defendant to introduce its designated portions, then I should likewise allow the plaintiffs to introduce their originally designated portions.

For clarity, I have attached a copy of the designations in question.

The magistrate ruled in the pretrial order that the "Plaintiffs shall designate which depositions of experts will be proffered in lieu of live testimony by April 17, 1990. Thereafter, defendant may file a motion in limine on that matter by April 20, 1990, and any response shall be submitted by April 25, 1990." (Filing 117, para. G).

In a letter to the magistrate dated April 18, 1990, counsel for the plaintiff stated that he intended to present his experts by live testimony rather than by deposition. (Filing 120). Counsel for the defendant, also in a letter dated April 18, 1990, to the magistrate, (filing 120) stated that plaintiffs' counsel had indicated his intention to present his expert witnesses by live testi-

mony rather than by deposition. He further stated that "It is both Mr. Robinson's and my belief that this resolves the questions remaining with respect to the Pretrial Order, except for . . .". He then goes on to discuss a matter not at issue here.

The question now is whether the defendant's designations in the pretrial order should be viewed as designations that were made only in the event that its objection to plaintiffs' designations was not sustained, or as designations separate from any designations made by the plaintiffs and any rulings thereon. I think a fair reading of these documents shows that the defendant intended its designations to become effective only if its objection to the plaintiffs' designations was overruled.

In each of the three designations the defendant states an objection to the plaintiffs' use of the depositions at trial on the ground that the defendant did not take the deposition for the purpose of preserving testimony for the plaintiffs' use at trial, but rather for its own discovery. It then says "without waiving the above objection, the United States designates, *in addition to the portions of Mr. [Boles', Smith's and Lloyd's] deposition already designated by the Plaintiffs in this action,* the following portions of [Boles', Smith's and Lloyd's] deposition:" (Emphasis supplied). If the defendant had meant this as a separate designation—that is, irrespective of the plaintiffs' designation or any ruling thereon—the defendant would not have included in their own designation "the portions of Mr. [Boles', Lloyd's and Smith's] deposition already designated by the plaintiffs". To adopt the position of the defendant would result in a somewhat absurd situation, where the plaintiffs' designations are kept out by virtue of its election to proceed with live testimony, but the defendant's designations, which include the plaintiffs' designations, are allowed into evidence. The obvious conclusion is that the defendant meant its designation request to become effective only if its objection was not resolved in its favor. Accordingly, the defendant's offer of its designated portions of the Boles', Smith and Lloyd (1989) depositions is denied.

## II.

### Applicable Law.

■ Under the Federal Tort Claims Act, the United States may be held liable for personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States acting within the scope of his or her employment under circumstances where a private person could be responsible to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). The "whole law", including the choice-of-law rules, of the state where the alleged act or omission occurred governs the rights and liabilities of the parties. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Brooks v. United States,* 695 F.2d 984 (5th Cir.1983). Because the accident allegedly occurred due to the negligence of the flight service station specialist employed at the Omaha, Nebraska, Flight Service Station, Nebraska law applies.

■ Under Nebraska law negligence is the doing of something, under circumstances similar to those surrounding the accident, that an ordinary, prudent person would not have done or failing to do something which an ordinary, prudent person would have done. *Sacco v. Gau,* 188 Neb. 808, 199 N.W.2d 605 (1972); *Good v. Jones,* 184 Neb. 454, 168 N.W.2d 520 (1969). To establish a cause of action for negligence under Nebraska law a plaintiff must show that there is a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately resulting from the undischarged duty. *Topil v. Hub Hall Co.,* 230 Neb. 151, 430 N.W.2d 306 (1988); *Tiede v. Loup Power Dist.,* 226 Neb. 295, 411 N.W.2d 312 (1987). The burden of proving negligence is on the party asserting it. The plaintiff must prove negligence by a preponderance of the evidence. *Bowerman v. Greenberg,* 142 Neb. 721, 7 N.W.2d 711 (1943). Negligence cannot be inferred from the fact that an accident occurred. *Id.*

## III.

### The Weather Briefing Information.

At issue is the sufficiency of the weather briefing given by flight service station specialist Robert Geranis to the caller identifying himself as "copter one one zero lima gulf". Although the caller did not identify himself by name, the evidence at trial led to no other conclusion than that pilot Craig Budden was the caller. Beginning at 2352.07 (5:52.07 local time) the following conversation took place between Budden and Geranis:

OMA FSS  Omaha Flight Service

N110LG  Yes copter one one zero lima gulf can you tell me what your ah latest requested reported weather for Broken Bow and Ainsworth are

OMA FSS  I don't think ah they're reporting this late hold on (pause) uh they're still reporting ah the Broken Bow now this is an hour old Broken Bow is an estimated one thousand five hundred broken six thousand overcast visibility was ten miles the winds two hundred at ten and the Ainsworth was an estimated five thousand broken visibility seven miles winds two ten at ten

N110LG  Okay and were they expect expecting any significant weather moving through that area in the next hour and a half

OMA FSS  You got a small area of marginal conditions ah right dead center the state its about probably sixty seventy miles wide and there's some scattered light snow shower activity in that area but about the worst I can find for forecast is occasional twelve hundred broken with a chance of three miles and light snow and fog ah

N110LG  Oh that's good news

OMA FSS  Until ten Z then after ten Z they might have a chance of some I F R conditions out there in the central part

N110LG  Okay but that's not significant you say that's ten zulu you said

OMA FSS  Yeah

N110LG  Okay so that's ah okay that's another ah

OMA FSS   Four A M

N110LG  Four A M yeah that's what I'm trying to figure out I didn't have a watch on me okay thank you

OMA FSS   Bye Bye

(Exhibit 102)

There is no dispute between the parties that Geranis' response to Budden's request for reported weather at Broken Bow and Ainsworth was sufficient. Geranis provided him with the most recent reported conditions at those two locations. The testimony at trial focused on Geranis' response to Budden's inquiry of significant weather moving "through that area" in the next hour and a half.

Geranis had at least three types of weather information available for pilot briefings at the Omaha FSS on December 20, 1985; the area forecast (FA) issued from Chicago that provided forecasts for a multi-state area, including Nebraska; the terminal forecasts (FT's) for various points in Nebraska; and the transcribed weather broadcasts (TWEB's) issued for specific routes of flight. The Omaha FSS was also equipped with radar.

1.  The Area Forecast (Exhibit 19, p. 21–22).

The area forecast had been issued at 1840 (12:40 p.m. local time) on December 20, 1985. It was valid at the time of the weather briefing and remained valid until 07Z (1:00 a.m. on December 21, 1985). It contained a forecast of light occasional moderate rime icing in clouds and precipitation from the freezing level to 12,000 feet, conditions spreading eastward and continuing beyond 07Z. The forecast of rime icing encompassed most of Nebraska, including Broken Bow and Ainsworth. (See Exhibit 40). Cloud ceilings in Nebraska were forecast as 1500 to 2500 feet broken to overcast, with a possibility of ceilings below 1000 feet.

2.  The Terminal Forecasts (Exhibit 39).

Geranis consulted the terminal forecasts for Grand Island, North Platte, and Norfolk. Beginning at 2125 (3:25 p.m.) on December 20, 1985, the Grand Island (GRI) terminal forecast called for ceilings of 6000 feet overcast and winds out of the south at 6 knots until 02Z (8:00 p.m.). From 02Z on,

1200 scattered, ceiling of 5000 feet overcast, winds south at 8 knots, *occasional ceiling at 1200 feet broken with a slight chance of visibility 3 miles in light snow and fog until 10Z.* (4:00 a.m.) After 10Z ceilings 1200 feet overcast, visibility 4 miles in fog with a chance of ceilings 500 feet overcast and visibility 2 miles, light snow and fog until 16Z. (10:00 a.m.) VFR conditions after 16Z. (Emphasis supplied).

Beginning at 2125 (3:25 p.m.) on December 20, 1985, the North Platte (LBF) terminal forecast called for 1000 feet scattered, ceilings of 3000 feet broken, winds south at 8, occasionally 1000 feet broken *with a chance of visibility of 3 miles in light snow* until 1Z (7:00 p.m.). From 1Z to 9Z (3:00 a.m.) 2000 feet scattered, occasional ceilings at 2000 feet broken with a slight chance of visibility of 3 miles in light snow and fog. (Emphasis supplied).

Beginning at the same time the Norfolk (OFK) terminal forecast called for 8000 scattered, 25,000 thin, broken until 0Z (6:00 p.m.). From 0Z until 3Z (9:00 p.m.) ceilings 6000 overcast. From 3Z until 10Z (4:00 a.m.) 1200 scattered, ceilings 5000 overcast, winds south at 8, *occasional ceilings at 1200 feet broken with a slight chance of visibility 3 miles in light snow and fog.* From 10Z until 16Z (10:00 a.m.) ceilings 1200 feet overcast, visibility 4 miles in fog with a chance of ceilings 500 feet overcast visibility 2 miles, light snow and fog. VFR conditions after 16Z.

3.  The TWEB's (Exhibit 39).

TWEB 265 covers the flight path corridor from North Platte to Valentine to Pierre, South Dakota. It was issued at 2250 (4:50 p.m.) on December 20, 1985, and called for frequent ceilings 1000 to 3000 feet but occasionally below 1000 feet and visibility below 3 miles in fog and light snow or freezing drizzle. TWEB 266 covered the flight path corridor from North Platte to Sioux Falls, South Dakota. It was issued at 2250 (4:50 p.m.) on December 20, 1985, and called for ceilings occasionally below 1000 feet and visibility below 3 miles in fog and light snow or freezing drizzle. The TWEB's were effective until 11:00 a.m. the next morning.

## IV.

### The Area Forecast.

■ The plaintiffs allege that Geranis acted negligently in failing to inform Budden of the contents of the area forecast which called for light, occasional moderate rime icing in clouds and precipitation. Geranis does not contest the fact that he did not advise Budden of the rime icing forecast. He testified that it was his conscious decision not to give the caller the rime icing information, because it was his conclusion that the weather described in the area forecast had moved east and south of the Broken Bow and Ainsworth areas. Instead he gave the caller the information contained in the terminal forecasts, because they were more current. When asked at his 1987 deposition why he did not include the area forecast information in his response to Budden, Geranis responded that he didn't believe that Broken Bow and Ainsworth were directly affected by that information, because the area that the caller described was very close to the western boundary of the area delineated in the rime icing forecast. He said there had been no surface reports of those conditions actually existing. At trial he testified that it was his belief that the weather conditions in the area forecast had moved to the east, and felt it was no longer pertinent to Broken Bow and Ainsworth.

Exhibit 40 is a map of the area covered by the rime icing forecast. Broken Bow and Ainsworth are not on the western edge of the forecast area, but are instead almost directly in the center from an east-west perspective. It is true, as the defendant points out, that no surface reports of icing were available at the time Budden called. But to following the defendants' reasoning is to suggest that forecasted conditions need not be given unless the forecasted conditions are in fact reported as occurring or as having occurred. Such rationale overlooks the reason for a forecast in the first place. The area forecast was in effect from 12:40 p.m. on December 20th until 1:00 a.m. on December 21st. The call occurred at 5:52 p.m. on December 20, not even half way through the valid forecast period.

Budden's call for weather information was a request for an abbreviated briefing; that is, he was asking for specific information. He did not request a standard briefing as evidenced by the absence of any discussion of the type of flight planned, the departure airport, the route of flight, the destination, the flight altitude, the estimated time of departure or the estimated time enroute. Geranis was not required to ask Budden if he wanted a standard briefing. Pursuant to Paragraph 166 of the Flight Services Handbook 7110.10G, such a query is required only when it is not clear which type of briefing is being requested. It was clear Budden was requesting an abbreviated forecast.

Paragraph 168(a) of the Flight Services Handbook sets out the conduct of an abbreviated briefing.

> When a pilot desires specific information only, provide the requested information. If adverse conditions *are present or forecast,* advise the pilot of this fact. Provide details on these conditions in accordance with paragraph 167(b)(1) if the pilot requests that you do so. (Emphasis supplied).

Paragraph 167(b)(1) reads:

> *Adverse Conditions*—Include this element when meteorological or aeronautical conditions are reported or forecast that might influence the pilot to alter the proposed flight.

Geranis testified that icing is an adverse condition.

Two expert witnesses testified for the plaintiffs that Geranis' failure to include this information had the effect of misleading Budden. Meteorologist Michael Smith testified that Geranis' statement that the worst he could find was an occasional 1200 broken with a chance of three miles and light snow and fog was inaccurate, because worse weather had been forecast. Jack Keehn, a former Flight Service Station weather briefer and air traffic controller testified that Geranis did not comply with the requirements of Paragraph 168 because he failed to advise the caller of the adverse weather. Although the area forecast was five hours old, it was current, and

if it was current it was pertinent. In his opinion Geranis did not act as a reasonable and prudent Flight Service Station specialist because he misled the pilot by not including the icing information in the "worst" he could find.

■ Under Nebraska law, a duty is an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. *Tiede v. Loup Power Dist.*, 226 Neb. 295, 411 N.W.2d 312 (1987). Geranis' failure to inform Budden of the rime icing precaution constituted a breach of his duty to Budden. Because the FAA has undertaken to advise requesting pilots of weather conditions, thus engendering reliance on such facilities, it is under a duty to see that the information that it furnishes is accurate and complete. *Pierce v. United States*, 679 F.2d 617, 621 (6th Cir.1982), quoted with approval in *Norwest Capital Management and Trust Co. v. United States*, 828 F.2d 1330 (8th Cir.1987). In *Norwest* the Eighth Circuit held that a Flight Service Station specialist's failure to inform a pilot of an area forecast that warned of icing constituted gross negligence. The pilot called FSS specialist Charles Shields at 4:16 a.m. and informed him that he would be departing from Rapid City at 6:00 a.m. headed for Casper, Wyoming. Shields described lowering cloud ceilings and previous IFR conditions. Shields did not inform the pilot of an area forecast that warned of icing over South Dakota and eastern Wyoming, because the forecast was due to expire at 6:00 a.m. and Shields knew the pilot would be calling back before take-off. When the pilot did call back, however, he talked to another FSS specialist who did not know that Shields had postponed informing the pilot of the icing forecast. The new forecast was issued at 5:40 a.m. and became effective at 6:00 a.m. It called for moderate mixed icing in the clouds over southwestern South Dakota and generally deteriorating weather conditions. It was unclear whether the updated report had been received at the time of the pilot's second call. The Eighth Circuit determined that it was immaterial whether the second FSS specialist had received the updated forecast at the time of the call. The court held that the second FSS specialist would know by looking at the briefing log that any information conveyed by Shields was ten hours old at the time the pilot received it and would know that a new forecast would be issued any moment. The court determined that he, too, was grossly negligent for failing to provide the pilot with accurate weather information and for preventing the pilot from having the correct weather information so as to allow him to make the critical judgment as to whether to fly into icing conditions. The court deemed it beyond speculation that the pilot would not have chosen to take off in an aircraft that was not equipped with de-icing equipment.

Geranis' failure to inform Budden of the forecast of rime icing undoubtedly contributed to Budden's decision to commence the flight, because N110LG was not certified to fly in any icing conditions. Federal Aviation Regulation § 135.227(2) prohibits take-off under VFR conditions into known light or moderate icing conditions unless the aircraft has functional deicing or anti-icing equipment protecting each rotor blade, propeller, windshield wing, stabilizing or control surface, and each airspeed, altimeter, rate of climb, or flight attitude instrument system. The icing information was a forecast that would have influenced Budden's decision to fly. The fact that Geranis was unaware that a flight was intended is irrelevant. He is required by the terms of Paragraph 168(a) to advise the caller of adverse conditions. His report of marginal conditions and scattered light snow shower activity was not a forecast of icing.

### V.

#### The TWEB's.

■ The plaintiffs also allege that a breach of duty occurred when Geranis failed to recite the contents of TWEB 265 and 266 for Budden. They contend that Geranis acted negligently in failing to inform Budden of the contents of TWEB 265 which called for frequent ceilings 1000 to 3000 feet, occasionally below 1000 feet and visibility below three miles in fog and light freezing drizzle; and of the contents of

TWEB 266 which called for ceilings occasionally below 1,000 feet and visibility below three miles in fog with patchy light snow or freezing drizzle.

First, TWEB's are designed for specific routes of flight. The caller gave no indication that he was flying from North Platte to Valentine or from North Platte to Sioux Falls. TWEB's are not characterized by the cities within its path, but rather by the area specifically from Point A to Point B. Second, the testimony indicated that the TWEB's do not contain any information that is not otherwise available in some other form. TWEB's are a compilation of various sources of information, such as area forecasts, terminal forecasts, surface reports and pilot reports. Geranis testified that if a forecaster created an area forecast, or a terminal forecast, or a TWEB, they would all basically be the same thing. The fact that the TWEB contained the mention of freezing drizzle as opposed to icing does not change this fact. The TWEB's presented a forecast very similar to the area forecast. Finally, the TWEB's do not forecast movement. Therefore the plaintiffs' assertion that Budden should have been given TWEB 265 because it was to the west of Broken Bow and Ainsworth is not persuasive. While it may be true that weather often does move directly from west to east, at times it may move in a different direction. For instance, Michael Smith testified that the precipitation at the time of this accident was moving from the northwest to the southeast. Geranis was not under a duty to inform Budden of the contents of TWEB 265 and 266.

## VI.

### Proximate Cause.

It must next be determined whether Geranis' failure to inform the pilot of the icing portion of the area forecast was a proximate cause of the accident. To establish that it was the plaintiffs must show that the defendant's negligence was a cause that in a natural and continuous sequence, unbroken by an efficient intervening cause, produced the injury and without which the injury would not have occurred. *Maloney v. Kaminski*, 220 Neb. 55, 368 N.W.2d 447 (1985). The plaintiffs must show that but for the negligence of the FAA, N110LG would not have crashed, *Shibata v. College View Properties*, 234 Neb. 134, 449 N.W.2d 544 (1989); or that the FAA's negligence was a substantial factor in bringing about the crash. *Travelers Indem. Co. v. Center Bank*, 202 Neb. 294, 275 N.W.2d 73 (1979).

In order to find that the negligence of the FAA in failing to give the icing portion of the area forecast, was a proximate cause of the crash, the plaintiffs must show by a preponderance of the evidence that icing caused the crash or was a substantial factor in bringing about the crash. The preponderance of the evidence does not support such a finding. The negligence of the FAA was not a proximate cause of the accident.

N110LG's route of flight from the southeast toward the northwest is depicted on Exhibits 124 and 120. Charles Hardin reported that he observed the aircraft flying north at approximately 6:30 p.m. It was flying at its normal speed of between 100 and 150 miles per hour. He guessed the aircraft to be flying at a height of between 500 and 600 feet. There was no rain or fog and it was fairly clear. The terrain of the area was generally flat.

David Hutchinson, of Rose, Nebraska, lived approximately 8 miles from the accident site. He heard a helicopter east of his home that evening. He estimated it to be flying between 80 and 120 miles per hour and it sounded low to him. The cloud ceilings were a minimum of 500 feet and more likely a minimum of 1000 feet. Hutchinson had two mercury vapor lights turned on at the time. A helicopter 1000 feet in the air would be able to see the lights no matter how bad the weather. He described the weather as drizzling and overcast. He did not recall any rain, and said it was more of a mist that would come and go. Visibility was one-half mile to one mile on the ground. The Hutchinson ranch is not a hilly terrain and is not highly covered with trees. (Filing 148).

Mike Kuchera of Rose, Nebraska, lived 5 to 6 miles from the accident site. He saw the helicopter as it came from the south-

east, passed over his home, and headed toward the northwest. He estimated the aircraft to be flying at 100 knots and at a height of 300 feet, give or take 100 feet either direction. He could not give an estimate on visibility, but did state that he saw the helicopter for one mile as it approached his ranch. He did not hear any unusual sounds, and it seemed to him that the helicopter was running fine and progressing normally. He described the helicopter as "just going right along" and had no reason to think that there were any problems of any kind as it flew by. He did not observe the helicopter turn around. At the time he observed the aircraft, precipitation in the form of a drizzle or mist was occurring. It was freezing on his car and he estimated that his windshield had one-quarter of an inch of ice on it. He did not observe any fog. He remembers thinking that in those freezing conditions he was glad it was someone else flying and not him. He had an all night mercury vapor light approximately 100 feet from his house. The lights were on inside his house and they could be seen from the outside. (Filing 135).

Kuchera also made a statement to the National Transportation Safety Board (NTSB) one week after the crash. At that time he estimated the airspeed to be 80 knots and described the weather as " 'textbook' icing conditions i.e. 28 [degrees], total humidity with freezing rain, winds were calm, limited visibility approximately [one-quarter] mile." (Exhibit 110).

Terry and Debbie Hollenbeck of Long Pine, Nebraska, were located 4 to 5 miles from the accident site. Their son came in the house and told them that a helicopter was coming. Terry Hollenbeck was concerned that the helicopter might be trying to interfere with his cattle, so he went outside to look at it. He saw it coming from the southeast from about one-half mile away headed toward the northwest. He could see it even though it was dark out. The speed of the aircraft did not vary at all. He did not know exactly how fast it was moving, but said it was getting right along. It wasn't going terribly slow, but it wasn't going as fast as an airplane. He estimated that it was flying at 200 feet. It did not turn at all and mostly went in a straight line. The landing light was on when he first saw it, but the pilot shut it off when the helicopter was about 300 yards from the house. Mr. Hollenbeck described the weather as being finer than a rain, more like a drizzle. He did not think it was heavy enough to need an umbrella. He also stated there was freezing drizzle, which he described as relatively light moisture. He doesn't remember observing any freezing on his vehicles. The sidewalk did not appear slick. The temperature was between 20 and 30 degrees and it was not foggy. The moisture in the air was not so bad that you couldn't see the aircraft for at least one-half of a mile. They shut off their outside porch light so that they could better see the helicopter. The porch light was not a mercury vapor light, but just a 200 watt flare bulb. The porch light wasn't on the porch, it was about 25 feet from the house on an 18–foot high pole. The lights in the house were on. He went back inside after it passed over the house because he decided it was not a threat to his cattle. (Filing 134).

Debbie Hollenbeck testified that she saw the helicopter coming from the southeast when it was one-half mile away. It was not completely dark and was more of a dusk. The aircraft was headed toward the northwest and had its landing light on until it got close to the house. They shut the porch light off so they could see the helicopter better. It was dusk, but they could still see the aircraft real well and could definitely make out the shape or outline of it as it came closer. She could not see the people inside. The speed of the aircraft was not something that indicated to her that the pilot was trying to land. He didn't cut his speed; it was steady and he went at the same speed toward the northwest. She guessed it was flying at a height of 200 feet based on her observation that it was about twice as high as the trees. She could see it for three miles as it went past. At that point she could no longer see it but could still hear it. She described hearing a very loud noise for 2 to 3 seconds that sounded like an engine revving up. The weather at the time was a light drizzle; it was a little heavier than a mist and if you

stood in it very long you would get wet. The temperature was 30 degrees or in the high 20's. At that temperature she is sure the drizzle was freezing as it came down. (Filing 137).

Mrs. Hollenbeck also made a statement to the NTSB one week after the accident. She in essence gave the same description of events as in her deposition, except that she described the precipitation as being light rain or wet snow. (Exhibit 110).

There were no witnesses to the crash itself.

There are a number of factors that contribute to my finding that icing was not the cause of this mishap. First, the evidence clearly shows that the aircraft was not weighed down due to ice; that is, ice did not build up to a point where the helicopter was unable to remain aloft. At the time of the impact, the rotor was rotating at a normal r.p.m. or cruise speed. If the rotor had picked up icing severe enough to increase the weight of the aircraft, the power needed to accomplish normal rotation would have exceeded the power available and the rotor system would have had no choice but to slow down. The damage pattern at the crash site indicated the rotors were functioning normally at 100% rotation. Further, any increase in weight would have called for increased power from the engine. Had the helicopter crashed due to an inability to stay aloft because of ice build up, it would have been due to the power needed exceeding the power available. When this occurs there is an engine "burn" where the engine becomes overheated and turbine blade damage occurs. There was no evidence of engine burn or turbine blade damage.

Michael Carnivale, an accident investigator and reconstructionist, testified that flying in drizzle for 8 to 10 miles would not create a significant build-up of ice on the helicopter, and that it certainly would not have been enough to cause the crash. Dr. Ray Hoxit, a meteorologist, stated that it was physically possible that N110LG picked up rime icing in the clouds in the last 2 miles before the crash, but that the amount would have been minute due to the time frame involved. Larry Boles, a heli-copter pilot and accident reconstructionist, testified that a good, steady, soaking winter rain would have been necessary to cause the helicopter to accumulate sufficient ice to cause it to go out of control. The intensity of the precipitation was a freezing light drizzle at the most. Precipitation intensities begin with mist, then increase to light drizzle, moderate drizzle, heavy drizzle, light rain, moderate rain and heavy rain. Light drizzle produces a couple of hundredths of an inch of precipitation in an hour. The precipitation totals in the area of the crash are depicted by the blue dots on Exhibit 124. The largest amount of precipitation recorded was at Ainsworth, where .01 hundredths of an inch of precipitation occurred in a 24–hour period ending at 6:00 p.m. on December 21st. The observation data from Rose, Nebraska, (represented by the blue dot just below the Kuchera ranch) indicate no precipitation was observed in the 24–hour period ending at 7:00 a.m. on December 21st. The other observations in the area indicate either no precipitation or only a trace.

Second, the crash was not caused by ice covering the windshield. The windshield had what was described as a "great" heater. Carnivale testified that if there was any ice being picked up by the helicopter, it would not have been a vision problem because the heater would have kept the windshield from icing over. Any ice picked up on the windshield would have been so minimal that it would not contribute to the crash. This negates a finding that the pilot became spatially disoriented due to icing on the windshield. Furthermore, Carnivale's investigation of the impact indicates that there was no evidence of any roll attitude. A roll attitude would be consistent with spatial disorientation or vertigo of the pilot. Had it been a situation in which the pilot could not see out the windshield, the aircraft could have been safely controlled by the instruments, including a functioning attitude indicator and radio navigational system. Although the aircraft was not certified to fly in IMC (instrument meteorological conditions), Budden was certified to fly in IMC and would have known how to use the instruments.

Third, the descriptions given by the eyewitnesses to the helicopter's behavior before the crash are not consistent with the plaintiffs' theory that N110LG was trying to land. Larry Boles testified that if the helicopter was starting to land in freezing drizzle it would have decelerated and descended, and the pilot would have looked for an open and flat place to land and would have circled around the intended point of landing. It was Boles' opinion that N110LG was trying to land because it was flying over lighted areas, was using its landing light, and was descending. It was his belief that the helicopter was trying to land from at least as far back as the Kuchera ranch.

Boles' opinion is not persuasive. The stronger testimony is that the helicopter had not decelerated but it was flying at a steady speed. Had the helicopter been attempting to land, it would have needed to decrease its speed to approximately 60 miles per hour. A calculation of the distance traveled between the time of take-off and the time of impact indicated an average airspeed of approximately 111 knots or 126 miles per hour. The speed at impact was determined by Carnivale to be in excess of 100 knots.

There was no evidence that the helicopter ever changed direction or circled over any of the eyewitnesses' ranches. They all reported a generally straight heading toward the north to northwest. Carnivale determined from his examination of the wreckage that the aircraft was headed northwest at the time of impact.

The Kuchera ranch was located about 6 miles from the accident site. N110LG needed only one-half mile to one mile at the most to land.

The distribution of the wreckage does not suggest that the pilot was trying to land at the accident site. It impacted in an extreme nose-down attitude at a high velocity. There was a relatively small area of wreckage. Had the pilot been attempting to land the wreckage would have been distributed in a more horizontal fashion.

The fact that the pilot turned on his landing light (also referred to as a night scanner) does not necessarily suggest that the pilot was attempting to land. Use of the light is consistent with a pilot's attempt to detect visible moisture in the air. Ronald Rodgers testified that he taught Budden that visible moisture could be seen by turning on the landing light.

The pilot was gradually descending, but he did so because the cloud ceilings were descending along his route of flight and the ground elevation was increasing. Exhibit 125 depicts the lowering ceilings, with the decreasing visibility and light drizzle or mist, and the increasing elevation into the sandhills area just past the Hollenbeck ranch. The result was a narrowing of the available space in which to fly. Scud clouds are depicted on Exhibit 125 below the cloud ceiling. Dr. Hoxit explained that scud clouds are layered clouds that exist fairly close to the ground. In this case they formed within a few hundred feet of the ground, especially near the accident site. Scud clouds are formed by precipitation falling into drier air, forming condensation when the air is cooled.

The testimony of Carnivale provides a persuasive explanation of the last moments before the impact. The pilot flew directly into the scud cloud build-up, and was in it before he realized it. He was in it long enough to realize he was not going to fly out of it. In response to this situation he rapidly lowered the collective (in layman's terms, he went down) in an attempt to duck out of the cloud. A rapid decrease in the collective will result in a tendency of the nose of the aircraft to drop. The barometric altimeter in N110LG was set at 3020, which is normal for a departure from Kearney. As the helicopter progressed towards Ainsworth the barometric pressure dropped. The barometric pressure at the accident site was 3014. That difference would result in a 60–foot discrepancy in the altimeter reading. An altimeter must be set to the exact barometric pressure and be set to take into consideration the altitude of the terrain to produce an exact altimeter reading. The altimeter read that the aircraft was 60 feet higher than it actually was. When the pilot made the downward avoidance maneuver to get out of the scud

cloud, he was 60 feet closer to the ground that he realized, and crashed.

The noise that Mrs. Hollenbeck heard was caused by a change in the direction of sound of the helicopter. The change in direction of sound was caused by the change in altitude of the aircraft.

Finally, there was no evidence of ice on the aircraft at the accident scene. If ice had formed on the helicopter prior to the crash, Carnivale testified, that he would have expected to see ice in the photos, even if the ice was knocked off at the time of the crash. The photos taken by Strand between 8:30 and 9:00 a.m. on the morning after the crash show no evidence of ice. (Exhibit 114). The temperature during the evening of December 20, 1985, did not rise above freezing. Dr. Hoxit testified that the temperature did not reach above 32 degrees until around 10:00 a.m. on December 21. Had ice been on the aircraft at the time of the crash, it would not have melted during the night.

Michael Smith testified that the temperature during the evening of December 20 rose to 35 degrees. He based his information on the weather observation at Rose, Nebraska, (Exhibit 199), which showed the highest temperature recorded between 7:00 a.m. on December 20 and 7:00 a.m. on December 21 was 35 degrees. The information does not state at what time the 35–degree temperature occurred during the 24–hour period. Dr. Hoxit's testimony is therefore more credible.

The expert testimony leads me to the conclusion that it was the pilot's continued flight into deteriorating weather conditions consisting of decreasing cloud ceilings and visibility, not icing, that caused this accident. Accordingly, judgment shall be for the defendant.